# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### September 3, 2009 Session

## JAMES L. MILLIGAN, JR. v. BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE

**Direct Appeal from the Chancery Court for Knox County**
**No. 171621-2     Jon Kerry Blackwood, Senior Judge**

_____

**No. E2008-02692-SC-R3-BP - Filed December 8, 2009**

_____

In this direct appeal, the issue presented is whether the trial court properly affirmed a Board of Professional Responsibility hearing panel's denial of a suspended attorney's petition for reinstatement of his law license. The trial court affirmed the hearing panel's decision that the attorney failed to present sufficient proof of his moral qualifications to practice law in this state and that his reinstatement will not be detrimental to the integrity and standing of the bar or the administration of justice or subversive to the public interest. After reviewing the entire record, we hold that the attorney failed to present sufficient evidence that he has the moral qualifications to practice law in this state and that his reinstatement will be not detrimental to the integrity and standing of the bar or the administration of justice or subversive to the public interest. Accordingly, the judgment of the trial court denying the petition for reinstatement is affirmed.

**Tenn. Sup. Ct. R. 9 § 1.3 Direct Appeal; Judgment of the Chancery Court Affirmed**

SHARON G. LEE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

Ronald L. Grimm, Knoxville, Tennessee, for the appellant, James L. Milligan, Jr.

Sandy Garrett, Nashville, Tennessee, for the appellee, Board of Professional Responsibility of the Supreme Court of Tennessee.

# OPINION

## Factual and Procedural Background

After receiving his law license in 1975, James L. Milligan, Jr. engaged in a primarily civil practice. In 1995, he started the law firm of Milligan and Associates and was employed there until his license was suspended in 2005. Milligan has had a lengthy involvement with the Board of Professional Responsibility ("the Board"), as is evident from the following account of events preceding and subsequent to his suspension.

In 1987, Milligan was privately admonished by the Board based on a client complaint. Thereafter, in 1994, this Court publicly censured Milligan and ordered that he be monitored by another attorney for two years for violations of Tennessee Supreme Court Rule 8, Disciplinary Rule ("DR") 1-102(A)(5)[1], DR 6-101(A)[2], and DR 7-101(A)[3], upon findings that because he maintained

---

[1] DR 1-102(A)(5) (2002) provided that a lawyer shall not "[e]ngage in conduct that is prejudicial to the administration of justice."

[2] In relevant part, DR 6-101(A) (1994) provided that a lawyer shall not:

> A lawyer shall not:
> (1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.
> (2) Handle a legal matter without preparation adequate in the circumstances.
> (3) Neglect a legal matter entrusted to him.

[3] DR 7-101(A) (1994) provided:

> (1) A lawyer shall act with reasonable diligence and promptness in representing a client.
> (2) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for communication or information.
> (3) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.
> (4) A lawyer shall not intentionally:
>> (a) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7-101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.
>> (b) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2-110, DR 5-102, and DR 5-105.
>> (c) Prejudice or damage his client during the course of the

an excessive number of cases, he was unable to adequately represent and communicate with his clients or conduct a proper investigation before filing lawsuits. In 1995, Milligan received a public admonition as the result of a complaint by another client. After these incidents, three complaints were filed with the Board which resulted in the suspension of Milligan's license.

The first of these three complaints, filed November 30, 1999, alleged that Milligan wrote a commission check in the amount of $216.67 from his client trust account to his then-associate, attorney G. Turner Howard, and that the bank dishonored the check because there were insufficient funds in the account. A second complaint, filed April 25, 2000, alleged that Milligan settled a personal injury claim arising out of an automobile accident on behalf of his client Kerry Johnson without consulting Johnson, that he forged Johnson's signature on the settlement check and a claim release, that he had a notary falsely notarize the release, and that he deposited the settlement funds totaling $16,000 in his own personal account. Based upon these two complaints and prompted by the Board's petition, this Court, on May 5, 2000, ordered the temporary suspension of Milligan's license. Upon petition by Milligan, we ordered the reinstatement of his license on June 19, 2000, pending a full disciplinary hearing and conditioned upon his retention of Terry Hall, a certified public accountant, to monitor the finances of his law practice and upon his further retention of Leroy Bible, a certified fraud examiner, to conduct a review of his law office accounts.

On August 17, 2000, the Board filed a petition for discipline against Milligan asserting the substance of the complaints of November 30, 1999, and April 25, 2000. On August 23, 2001, the Board filed a supplemental petition for discipline to also include matters in an additional complaint lodged against Milligan on May 22, 2001, wherein it was alleged that Bible's audit of the accounts of Milligan's firm, including the client trust account, had revealed financial improprieties and that Milligan had not cooperated with the audit.

The Board's hearing panel committee ("the Panel"), after a full disciplinary hearing, ruled that Milligan had violated numerous disciplinary rules. Specifically, with regard to the matters alleged in the complaint of November 30, 1999, the Panel found that Milligan misappropriated funds by writing the check for insufficient funds to his associate Howard and thereby violated DR 1-102(A)(4),[4] (5) and (6)[5] and DR 9-102(B)(3).[6] With regard to the April 25, 2000 complaint, the

---

professional relationship, except as required under DR 7-102(B).

[4] DR 1-102(A)(4) (2002) provided that a lawyer shall not "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

[5] DR 1-102(A)(6) (2002) provided that a lawyer shall not "[e]ngage in any other conduct that adversely reflects on his fitness to practice law."

[6] DR 9-102(B)(3) (2002) provided that a lawyer shall "[m]aintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and render appropriate accounts to the client regarding them."

3

Panel found that Milligan settled Johnson's personal injury claim without Johnson's prior authorization, that he forged the signatures of Johnson and Johnson's wife on the back of the settlement check, that he forged the Johnsons' signatures on the release document tendered by defense counsel, that he had a notary employed in his office falsely notarize the forged signatures on the release document, and that he deposited the settlement check in his own personal bank account, thereby commingling his client's funds with his personal funds. The Panel also found that in an effort to conceal his misconduct, Milligan later procured false affidavits from the Johnsons indicating that they had approved the settlement of their claim in the amount of $16,000 and had approved Milligan's endorsement of the settlement draft and release document. The Panel also found that when Milligan distributed the settlement proceeds, no medical or litigation expenses were deducted. The Panel found that these actions by Milligan in his representation of the Johnsons violated DR 1-102(A)(3),[7] (4), (5), and (6); DR 7-102(A)(3),[8] (4),[9] (5),[10] (6),[11] and (7);[12] and DR 9-102(A)[13] and (B).[14] With regard to the third complaint of May 22, 2001, based upon the fraud

---

[7] DR 1-102(A)(3) (2002) provided that a lawyer shall not "[e]ngage in illegal conduct involving moral turpitude."

[8] DR 7-102(A)(3) (2002) provided that in the representation of a client, a lawyer shall not "[c]onceal or knowingly fail to disclose that which the lawyer is required by law to reveal."

[9] DR 7-102(A)(4) (2002) provided that in the representation of a client, a lawyer shall not "[k]nowingly use perjured testimony or false evidence."

[10] DR 7-102(A)(5) (2002) provided that in the representation of a client, a lawyer shall not "[k]nowingly make a false statement of law or fact."

[11] DR 7-102(A)(6) (2002) provided that in the representation of a client, a lawyer shall not " [p]articipate in the creation or preservation of evidence when the lawyer knows or it is obvious that the evidence is false."

[12] DR 7-102(A)(7) (2002) provided that in the representation of a client, a lawyer shall not "[c]ounsel or assist the client in conduct that the lawyer knows to be illegal or fraudulent."

[13] In pertinent part, DR 9-102(A) (2002) provided: "All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable insured depository institutions maintained in the state in which the law office is situated."

[14] DR 9-102(B) (2002) provided:

A lawyer shall:

(1) Promptly notify a client of the receipt of the client's funds, securities, or other properties;

(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable;

(3) Maintain complete records of all funds, securities and other properties of a client

4

examiner's audit, the Panel found that during 1999, Milligan overdrew client trust accounts on at least twenty-four occasions and on thirty-two separate occasions withdrew funds from the client trust account in cases prior to the deposit of case settlement proceeds. The Panel also noted Milligan's admission that he received payment of attorney's fees in cases where settlement proceeds had not yet been received and that he deducted arbitrary charges for "word processing, photocopy, communications, etc." from client shares of settlement proceeds. Finally, the Panel found that the examiner's report demonstrated that Milligan failed to maintain adequate records and an adequate accounting system and that Milligan had deposited settlement proceeds into accounts other than client trust accounts, including his own personal checking account. Based upon these findings, the Panel ruled that Milligan violated DR 1-102(A)(1),[15] (4), (5), and (6); DR 2-106(A);[16] DR 7-101(A)(4)(b)[17] and (c);[18] and DR 9-102(A)(2)[19] and (B)(3).[20]

In determining an appropriate sanction, the Panel considered as aggravating circumstances the admonitions Milligan received in 1987 and 1995, the public censure he received in 1994, his failure to comply with the accounting procedure recommendations of a Tennessee Bar Association law practice management consultant who supervised Milligan in 1999, and his failure to fully cooperate with certified fraud examiner Bible. In mitigation, the Panel considered that Milligan had

---

coming into the possession of the lawyer and render appropriate accounts to the lawyer regarding them;

(4) Promptly pay or deliver to the client as requested by a client the funds, securities or other properties in the possession of the lawyer which the client is entitled to receive.

[15] DR 1-102(A)(1) (2002) provided that a lawyer shall not "[v]iolate a disciplinary rule."

[16] DR 2-106(A) (2002) provided: "A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee."

[17] DR 7-101(A)(4)(b) (2002) provided that a lawyer shall not intentionally "[f]ail to carry out a contract of employment entered into with a client for professional services, but a lawyer may withdraw as permitted under DR 2-110, DR 5-102, and DR 5-105."

[18] DR 7-101(A)(4)(c) (2002) provided that a lawyer shall not intentionally "[p]rejudice or damage the client during the course of the professional relationship, except as required under DR 7-102(B)."

[19] DR 9-102(A)(2) (2002) provided:

Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited [in an identifiable insured depository institution maintained in the state in which the law office is situated], but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

[20] See footnote 14.

covered the checks returned for insufficient funds and that no individual had lost money as a result of Milligan's offenses. Upon consideration of all of the recited disciplinary rule violations and the noted aggravating and mitigating circumstances, the Panel ruled that Milligan be disbarred from the practice of law.

Milligan appealed the Panel's decision to the Knox County Chancery Court. Upon its independent assessment of the evidence, in June of 2004, the Chancery Court ruled that the sanction imposed by the Board was excessive. With regard to the insufficient funds check that Milligan issued to his associate Howard, the Chancery Court noted that the Board was advised of this infraction by letter from Howard "in consultation with Mr. Milligan," and that Howard stated in the letter that he had not been familiar with the bank's procedure with respect to the amount of time checks were held, that he (Howard) accepted full responsibility for not having made sufficient inquiry, and that since the incident, Milligan's firm had implemented "a vigorous fail-safe procedure." Contrary to the decision of the Panel, the Chancery Court concluded that the Howard matter did not involve dishonesty, fraud or deceit, was "de minimis" and "need not be further noticed."

With regard to the Johnson matter, the Chancery Court noted that after Milligan filed the personal injury action on behalf of Johnson, Johnson advised him that he was about to be incarcerated for arson and drug possession. The court noted Milligan's testimony that Johnson had authorized Milligan to use his discretion in settling the claim during his incarceration and had further authorized him to execute any documents necessary to the settlement and to receive any settlement proceeds and treat such proceeds as his (Milligan's) own, to be paid to Johnson upon his release from prison with interest. The court found that the $16,000 settlement negotiated by Milligan was within the range previously agreed to by Johnson; that while Johnson was in prison, Milligan had advised him that the case was going to be settled; that after his release, Johnson voiced his satisfaction with the settlement; and that later when Milligan paid Johnson his portion of the settlement proceeds, both Johnson and his wife executed affidavits attesting that Milligan had been given full approval to settle the case for a reasonable amount, to execute a release, to endorse the settlement check, and to utilize the settlement funds as his own until Johnson's release from prison. The court acknowledged that by subsequent affidavit, Johnson recanted these avowals, claiming that he had not read the prior affidavit; however, the court found that this recantation was not credible, noting inconsistencies in Johnson's testimony as to whether he had read the first affidavit before executing it. In sum, the Chancery Court found Milligan's conduct in regards to the Johnson matter to be "unconventional," "troublesome" and "a dumb and stupid thing to do," but concluded that "it was an isolated event, [and] there was no pattern of similar conduct."

Next, the Chancery Court addressed infractions attributed to Milligan by fraud examiner Bible in connection with Bible's audit of Milligan's law office finances. The court noted that Bible's audit only covered the year 1999. The court considered the testimony of Terry Hall, the certified public accountant appointed by the Supreme Court to oversee Milligan's office manager, who we had, in turn, designated to supervise Milligan's trust account. The court also considered an audit of Milligan's finances by another certified public accountant, James Lloyd, whose testimony was

6

apparently before the Chancery Court but not before the Panel.[21]  Based upon Lloyd's testimony and Hall's audit, the court concluded that the audit report criticizing Milligan's accounting practices was incomplete and misrepresented Milligan's accounting records.  The court found that as a result of Hall's investigation and testimony, "most of the questions raised by Mr. Bible's report were explained and many of his negative conclusions corrected."  The court observed that DR 2-106, which prohibits an attorney from charging an illegal or excessive fee, was cited as having been violated without specification as to how the rule was violated.  The court further observed that while the rule that addresses the need of preserving the identity of a client's funds "was violated on occasion[,] . . . . [t]he majority of these violations were corrected."  The court stated that "all of the CPAs agree that Milligan *never* misappropriated clients' funds and all of his clients received their proper remittances."  The court also discounted two matters that the Panel had relied on as aggravating circumstances, Milligan's alleged failure to comply with accounting procedure recommendations of the Tennessee Bar Association law practice management consultant who supervised Milligan in 1999, and his alleged failure to fully cooperate with certified fraud examiner Bible.  The court found little in the record to support either of these allegations.

In summary, the Chancery Court found that Milligan regretted his errors in judgment and had reformed his office procedures.  The Chancery Court referenced our suspension of Milligan's license in May of 2000, and observed that the resulting publicity and loss of clients had cost Milligan "a great deal of money" and that Milligan had also incurred the expense of modifying his accounting procedures and the expense associated with the investigation of his trust accounts by Bible.  Based upon these findings, the additional finding that since 1999 there had been no other offenses, and the presumption that henceforth Milligan's "trust procedures will be in strict compliance with the Rules," the Chancery Court ruled that further suspension was not warranted and that public censure was the appropriate sanction.

The Board appealed the Chancery Court's decision to this Court, arguing that the Chancery Court erred in concluding (1) that Milligan did not misappropriate funds; (2) that Milligan's use of Johnson's funds for personal purposes was not a serious disciplinary violation; and (3) that public censure was the appropriate sanction for Milligan's actions.  See Milligan v. Bd. of Prof'l Responsibility, 166 S.W.3d 665, 671 (Tenn. 2005).

As to the insufficient funds check Milligan wrote to Howard, we noted that funds for payment should have been in the client trust account before any disbursements were made, and, therefore, we determined that Milligan's actions constituted a misappropriation of funds, and a violation of  DR 1-102(A)(1), (4), (5), and (6); and DR 9-102(B)(3).

---

[21] At the time of the Chancery Court hearing, section 1.3 of Tennessee Supreme Court Rule 9 provided that the trial court's review "shall be on the transcript of the evidence before the hearing committee, its findings and judgment *and upon such other proof as either party may desire to introduce*." Tenn. Sup. Ct. R. 9, §1.3 (2005).  The current standard limits the trial court's review to the transcript of the evidence that was before the hearing panel, and the trial court may take additional proof only as necessary to resolve allegations that the hearing panel engaged in irregular procedure.  Tenn. Sup. Ct. R. 9, § 1.3 (2007).

With regard to the Johnson matter, we determined that Milligan's signing of the Johnsons' names to the release, whether or not he had their permission to do so, and his instructing a notary to falsely notarize their signatures involved dishonesty, fraud, deceit, or misrepresentation in violation of DR 1-102(A)(4), DR 1-102(A)(5), and DR 1-102(A)(6). We pronounced these violations to be "very serious and indicative of conduct that should not and will not be tolerated." Milligan, 166 S.W.3d at 672.

Finally, with respect to those matters related to the audit of Milligan's finances by fraud investigator Bible, we found that it was established that Milligan had overdrawn his client trust account on at least twenty-four occasions during 1999, that he had used client funds before settlement proceeds had been deposited in the client trust account, and that he had deposited client funds in accounts other than the client trust account, one of which was his own personal checking account. We noted that in one instance, Milligan settled a client's case for $50,000 on May 7, 1999, and deposited the proceeds in his trust account on the same day. Milligan disbursed $29,924.21 to the client on May 28, 2002; however, between May 7, 1999, and May 28, 2002, the balance in the trust account had dipped below $29,924.21 and from May 8, 1999, through December 31, 1999, Milligan had incurred $766 in overdraft charges on the account. Upon these findings, we concluded that Milligan misappropriated funds in violation of DR 1-102(A)(1), (4), (5), and (6); DR 2-106(A); DR 7-101(A)(4)(b) and (c); and DR 9-102(A)(2) and (B)(3). In arriving at an appropriate sanction, we considered as aggravating factors that Milligan was admonished privately in 1987, publicly censured in 1994, and publicly admonished in 1995. We also considered as an aggravating factor that in 1999, the Board required Milligan to consult with a Tennessee Bar Association law practice management consultant who advised Milligan that he should make certain changes in his accounting procedures and that Milligan failed to implement these recommended changes. We determined that the evidence was insufficient to support the charge that Milligan had failed to cooperate with fraud investigator Bible, and thus, that was not considered as an aggravating factor. As mitigating factors, we considered that Milligan ultimately covered the checks returned for insufficient funds and that there was no proof that any individual suffered a loss of funds as a result of Milligan's actions. Based upon Milligan's infractions, the aggravating and mitigating factors, relevant case law, and the record as a whole, we concluded that it was appropriate that Milligan be suspended from the practice of law for a period of two years and pay the costs of the disciplinary hearing. Our opinion was released on June 28, 2005.

On June 18, 2007, Milligan filed a petition with the Board for reinstatement of his law license in accordance with Tennessee Supreme Court Rule 9, section 19.3, which sets forth the burden of proof imposed upon an attorney seeking reinstatement as follows:

> [T]he petitioner shall have the burden of demonstrating by clear and convincing evidence that the attorney has the moral qualifications, competency and learning in law required for admission to practice law in this state and that the resumption of the practice of law within the state will not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive to the public

interest.

The Board appointed a hearing panel ("the Panel") to consider the merits of Milligan's petition and determine the propriety of reinstatement in accord with section 19.3, and the Panel heard the case on December 13, 2007. In addition to his own testimony, Milligan presented the testimony of six witnesses, consisting of friends, clients, attorneys who had had professional interaction with Milligan, and a retired chancellor before whom Milligan had frequently practiced law during the years preceding his suspension. The Board presented no witnesses in support of its argument that Milligan's license should not be reinstated.

On January 10, 2007, the Panel filed its judgment denying reinstatement, concluding that although Milligan satisfactorily demonstrated that he has the competency and learning to practice law in this state, he failed to present sufficient proof that he has the requisite moral qualifications to do so and further failed to meet his burden of proof showing that his reinstatement will not be detrimental to the integrity and standing of the bar or administration of justice or subversive to the public interest. In explanation of its conclusion that Milligan failed to offer adequate evidence of his remorse and rehabilitation, the Panel noted that Milligan's witnesses "either did not have a sufficient basis for their testimony or they were not fully informed as to the findings of the Supreme Court regarding his initial suspension." The Panel was also concerned with Milligan's failure to adequately explain his willingness to involve the notary who, at Milligan's behest, falsely notarized the Johnsons' signatures, Milligan's continuing insistence that he had permission to sign the Johnsons' names to the settlement documents and his treatment of the mishandling of the trust accounts and misuse of client funds "as more of an accounting issue than a breach of trust."

Milligan filed a petition for writ of certiorari, appealing his case to the Knox County Chancery Court. Upon its review of the record before the Panel, the Chancery Court agreed with the Panel's decision that Milligan's petition for reinstatement should be denied as a result of his failure to present clear and convincing evidence that he has the moral qualifications to practice law in this state, finding insufficient proof of Milligan's rehabilitation and remorse since his suspension. Like the Panel, the Chancery Court was disturbed by Milligan's willingness to enlist the aid of his employee (the notary) in his false dealing and fraud and his lack of an explanation in that regard. Referencing this finding and our previous conclusions that Milligan's actions constituted misappropriation of funds, involved dishonesty, fraud, deceit, or misrepresentation, were prejudicial to the administration of justice, and adversely reflected on his fitness to practice law, the Chancery Court also agreed with the Panel's decision that the reinstatement of Milligan's license would have a detrimental effect on the standing or the integrity of the bar or the administration of justice or be subversive to the public interest. Milligan now appeals to this Court pursuant to Tennessee Supreme Court Rule 9, section 1.3.

**Analysis**

The source of authority of the Board of Professional Responsibility and its functions lies in the Supreme Court. Nevin v. Bd. of Prof'l Responsibility, 271 S.W.3d 648, 655 (Tenn. 2008);

Brown v. Bd. of Prof'l Responsibility, 29 S.W.3d 445, 449 (Tenn. 2000). Included in our duty to regulate the practice of law in this state is the ultimate disciplinary responsibility for violations of the rules governing the legal profession. Doe v. Bd. of Prof'l Responsibility, 104 S.W.3d 465, 470 (Tenn. 2003). Thus, we review judgments in light of our "inherent power . . . and fundamental right to prescribe and administer rules pertaining to the licensing and admission of attorneys." In re Burson, 909 S.W.2d 768, 773 (Tenn. 1995).

Tennessee Supreme Court Rule 9, section 1.3, provides that the trial court's review of a hearing panel's decision is restricted to the transcript of the evidence before the hearing panel unless "allegations of irregularities in the procedure before the panel are made." Tenn. Sup. Ct. R. 9, § 1.3; see also Bd. of Prof'l Responsibility v. Love, 256 S.W.3d 644, 651 (Tenn. 2008).

The trial court, after reviewing the transcript and any additional necessary evidence, has several options. The trial court may affirm the decision of the panel, remand the case for further proceedings, or reverse or modify the decision. A reversal or modification of the panel's decision may be made only if the trial court finds that

> the rights of the petitioner have been prejudiced because the panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in light of the entire record.

Tenn. Sup. Ct. R. 9, § 1.3. Although the trial court may affirm, remand, reverse, or modify a hearing panel decision, the trial court may not substitute its judgment for that of the panel as to the weight of the evidence on questions of fact. Id.

Our review of a trial court's decision in a disciplinary matter is also governed by Tennessee Supreme Court Rule 9, section 1.3. Our standard of review under this section is virtually identical to the standard applicable to our review of an administrative agency's final decision in a contested case under the Uniform Administrative Procedures Act. Love, 256 S.W.3d at 653. This standard, as set forth in Tennessee Code Annotated section 4-5-322(h) (2005), provides as follows:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> > (1) In violation of constitutional or statutory provisions;
> > (2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

Thus, in cases such as the one now before us where the grounds for reversal under subsections (1), (2), and (3) are not present, we must uphold the hearing panel's decision "unless the decision was either arbitrary or capricious, 'characterized by an abuse, or clearly unwarranted exercise, of discretion' or lacking in support by substantial and material evidence." Hughes v. Bd. of Prof'l Responsibility, 259 S.W.3d 631, 641 (Tenn. 2008). We have approved the following language pertinent to a court's review of an administrative agency decision as an appropriate guide for a court seeking to ensure that a hearing panel's decision was not in violation of subsections (4) or (5):

> In its broadest sense, the standard[s in (4) and (5)] require[] the court to determine whether the administrative agency has made a clear error in judgment. An arbitrary [or capricious] decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion. . . .
>
> [T]he court should review the record carefully to determine whether the administrative agency's decision is supported by "such relevant evidence as a rational mind might accept to support a rational conclusion." . . . The evidence will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed.

Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n, 876 S.W.2d 106, 110-11 (Tenn. Ct. App. 1993) (citations omitted); see also City of Memphis v. Civil Serv. Comm'n of Memphis, 216 S.W.3d 311, 316-17 (Tenn. 2007). We are constrained, as is the trial court, from substituting our judgment for that of the hearing panel as to the weight of the evidence on questions of fact. Love, 256 S.W.3d at 653.

Governed by this standard of review, we must determine whether the trial court properly affirmed the Panel's ruling that Milligan failed to present adequate proof that (1) he has the moral qualifications to practice law in this state and (2) that his readmission would not be detrimental to the integrity and standing of the bar or the administration of justice or subversive to the public interest.

The license to practice law in this state is not a right, but a privilege. See Tenn. Sup. Ct. R. 9, § 3.1. And, as we stated above, under Tennessee Supreme Court Rule 9, section 19.3 the

11

reinstatement of an attorney's license is contingent upon proof by clear and convincing evidence that the attorney has (1) the moral qualifications and (2) the competency and learning required to practice law in this state; and (3) that his or her resumption of the practice of law within the state will not be detrimental to the integrity and standing of the bar or the administration of justice or subversive to the public interest. "Clear and convincing evidence" has been defined as follows:

> While [the clear and convincing standard] is more exacting than the preponderance of the evidence standard, it does not require such certainty as the beyond a reasonable doubt standard.
>
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.

Hughes, 259 S.W.3d at 642. In determining whether the Panel and the trial court properly denied Milligan's petition for reinstatement, we must review the record that was before the Panel for clear and convincing evidence that Milligan met each of the three requirements set forth in Tennessee Supreme Court Rule 9, section 19.3. In accord with the noted standard of review, it is our duty to ensure that the decision to deny Milligan's petition for reinstatement was based upon a course of reasoning or exercise of judgment and did not disregard the facts or circumstances without some basis that would lead a reasonable person to reach the same conclusion.

Upon review of the record before the Panel, it is our determination that Milligan failed to present clear and convincing evidence that he possesses the moral qualifications that are required for reinstatement of his license as set forth at section 19.3 and that his reinstatement will not be detrimental to the integrity and standing of the bar or the administration of justice or subversive to the public interest. Therefore, the decision of the Panel and the affirming decision of the trial court are well supported.

**Moral Qualifications**

First, we address the issue of whether Milligan presented clear and convincing evidence that he has the moral qualifications required to practice law in this state.

Although we ordinarily apply the American Bar Association's Standards for Imposing Lawyer Sanctions (1986, as amended 1992) ("ABA Standards") to attorney disciplinary matters, see Tenn. Sup. Ct. R. 9, § 8.4, these standards provide scant assistance in identifying specific prerequisites for reinstatement after an attorney's license has been suspended for a disciplinary violation. Standard 2.10 of the ABA Standards simply proclaims that "[p]rocedures should be established to allow a suspended lawyer to apply for reinstatement," and the Commentary to Standard 2.10 provides little additional guidance, stating:

12

> Since the purpose of lawyer discipline is not punishment, reinstatement is appropriate when a lawyer can show rehabilitation. Application for reinstatement should not be permitted until expiration of the ordered period of suspension and generally not until at least six months after the effective date of suspension. A lawyer should not be reinstated unless he can show by clear and convincing evidence: rehabilitation, compliance with all applicable discipline or disability orders and rules and fitness to practice law.

Given the lack of clear guidance provided by the ABA Standards, the states have independently developed criteria for reinstatement after suspension. Although the ABA Standards alluding to reinstatement do not expressly mention "moral qualifications," all states require some sort of proof of moral character. Kimberly A. Lacey, Note, Second Chances: The Procedure, Principles, and Problems with Reinstatement of Attorneys after Disbarment, 14 Geo. J. Legal Ethics 1117, 1117 (2001). In general, the moral character requirement requires that petitioners show that they have undergone a "moral change" so that the weaknesses that produced the prior conduct have been corrected. In re Reinstatement of Wiederholt, 24 P.3d 1219, 1228 (Alaska 2001); In re Reinstatement of Ramirez, 719 N.W.2d 920, 921 (Minn. 2006). Courts look at various indicators of this moral change, including honesty, remorse, and activity during suspension.

Honesty is considered to be a centerpiece of good moral character. See Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 247 (1957) (Frankfurter, J., concurring). In the readmission hearing for an attorney who had been disbarred for theft of funds from her law firm, witnesses testified that the experience of imprisonment and disbarment had made the attorney "brutally honest" and "extremely candid" in her dealings with others. Ramirez, 719 N.W.2d at 923. In a Mississippi case that involved an attorney who had been suspended for three years for commingling funds with his own funds and for misusing a trust account, the court was impressed that the attorney, who had only been caught for misusing one client's funds, nevertheless "voluntarily presented evidence of two other instances" of misappropriation. See In re Petition of Flautt, 890 So. 2d 928, 932 (Miss. 2004).

Remorse and awareness of prior wrongdoing are also regularly cited as marks of good moral character, and various jurisdictions have recognized these as appropriate factors to consider in gauging moral character. See Wiederholt, 24 P.3d at 1227-28 and cases cited therein. A recent Oklahoma case involved an attorney who resigned after it was discovered that he had misappropriated $50,000 in fees belonging to his employer law firm. In re Reinstatement of Mumina, _ P.3d _, __, 2009 WL 3113260, at *1 (Okla. 2009). In his later readmission proceedings, the court praised the petitioner for his demonstrated level of remorse and comprehension of wrongdoing. The attorney stated that he was guilty of crimes, "freely admitted that there was 'nothing right' about him having taken the funds," and spoke of his downfall to law students and young attorneys. Id. at *4-5. In contrast to the repeated and public statements of remorse in Mumina, the petitioning attorney in Wiederholt was not readmitted in part due to his utter lack of remorse. See Wiederholt, 24 P.3d at 1229. This attorney had been disbarred for forging his client's signature on a check and filing false statements that his client's judgment had not been satisfied. The

13

court emphasized that the petitioner's own testimony demonstrated that he had not rehabilitated himself because he refused to admit his prior wrongdoing and instead, during the readmission hearing, "continued to maintain that his past conduct did not warrant disbarment" and "stated that he did not believe that he had acted unethically." Id.

In determining whether an attorney has adequately demonstrated good moral character, courts also look to the nature of activity that the attorney has engaged in during the period of suspension. In this regard, courts have sought external evidence of rehabilitated character in "examples of ethical, fair, principled, and generally good conduct." In re Disciplinary Proceedings Against Carroll, 675 N.W.2d 792, 798 (Wis. 2004). Petitioners have gained court approval by participating in "legal wellness" programs or educating young lawyers on ethical issues. See Flautt, 890 So. 2d at 932; Mumina, 2009 WL 3113260, at *5. Courts have also favorably considered activity showing civic-mindedness. See Fla. Bd. of Bar Exam'rs ex rel J.J.T., 761 So. 2d 1094, 1096-97 (Fla. 2000) (emphasizing the importance of "positive action" and noting that this petitioner "can show only a handful of instances of volunteer community service" and that petitioner's "most active participation did not occur until shortly before the rehabilitation hearing"); In re Pool, 517 N.E.2d 444, 448 (Mass. 1988) (in the case of an attorney who had been disbarred for breaching confidence with a criminal client, finding it noteworthy that the disbarred petitioner had been actively engaged in the community and "wrote a book for children and edited an album on the history of [Harrison County, West Virginia]"); In re Griffith, 913 P.2d 695, 700 (Or. 1996) (stating that the court will look to "evidence of the applicant's participation in activities for the public good").

Courts are often presented with the testimony of character witnesses who have interacted with the attorney during the period of suspension and describe behavior consistent with rehabilitation and remorse. It is of critical importance that during the period of interaction, the witness was aware of the nature of the misconduct that resulted in suspension and that there was a sufficient degree of interaction between the witness and the petitioning attorney so that the witness had a reasonable basis for his or her opinion. Otherwise, the witness's testimony will carry little, if any, weight. See Wiederholt, 24 P.3d at 1230 (upholding a finding that reinstatement was not warranted where petitioner's witnesses "did not have sufficient information about his moral qualifications" and "had virtually no knowledge of how he conducted himself in the practice of law or the events that led to his disbarment"); Carroll, 675 N.W.2d at 798 (denying reinstatement where petitioning attorney did not provide witnesses who could "giv[e] examples of . . . *post-suspension* activities in a favorable light, whether they be business, civil, or personal related" (emphasis added)). Further, the mere statement by a witness that the petitioner currently has good moral character has been held to be insufficient to demonstrate the sort of rehabilitation that would suggest that the conduct will not be repeated. Griffith, 913 P.2d at 700.

There is a dearth of Tennessee case law setting forth specific examples of proof that will establish that an attorney possesses the moral qualifications required for reinstatement. However, in Murphy v. Bd. of Prof'l Responsibility, 924 S.W.2d 643, 647 (Tenn. 1996), this Court stated that the mere conclusory statements of witnesses that the petitioning attorney had "paid the price," was remorseful for his actions, and had rehabilitated himself were not sufficient proof of the attorney's

moral character. We indicated that the attorney seeking reinstatement must also produce proof of "specific facts and circumstances which have arisen since [the attorney's] convictions that demonstrate either rehabilitation or remorse." Id. at 647. In a more recent decision, Hughes, 259 S.W.3d at 643, we reiterated this requirement of "specific facts and circumstances." In Hughes, the petitioning attorney was held to have satisfactorily established the moral qualification requirement of section 19.3 upon his presentation of the testimony of multiple witnesses who "provided details as to the positive changes in his character and behavior since his conviction." Id. at 644. We noted that "[m]any of the witnesses described the different ways in which [the attorney] had continuously demonstrated the transformation of his character." Id.

As noted, in addition to his own testimony, Milligan presented the testimony of six of his acquaintances as proof that he possesses the qualities required for reinstatement, including the necessary moral character. However, this testimony must be discounted for two reasons: (1) these witnesses were largely unaware of the specific conduct that led to Milligan's suspension; and (2) all but one of the witnesses had minimal contact with Milligan during the period of his suspension. The testimony of each of these witnesses is summarized as follows.

Abe Lane testified that he was a family friend of Milligan's parents and has known Milligan since he was in high school. Lane stated that he always found Milligan "trustworthy in anything you told him and not dishonest" and that he "never found [Milligan] in an untruth." However, Lane admitted that he was not aware of the facts that resulted in Milligan's suspension, presented no specific facts or circumstances showing that Milligan has undergone a moral change since his suspension, and acknowledged that he has only seen Milligan two or three times since he was suspended.

Warren Michael Willis, who was once married to Milligan's ex-wife, testified that he has known Milligan almost twelve years and has done computer work for Milligan over the past two years. Willis testified that during the two-year suspension period, he and Milligan had telephone conversations, and he worked on Milligan's computer six or eight times. Willis attested that over the past two years, he has seen Milligan "interact with other people" and that "[i]t doesn't seem to matter to Mr. Milligan whether somebody has nothing or is very rich or very poor. He treats everybody the same." While Willis indicated that Milligan is honest and that he trusts him, nowhere in his testimony did Willis describe specific facts or circumstances showing Milligan's remorse or rehabilitation after being suspended. And while it appears that Willis has had more extensive contact with Milligan than the other witnesses, he was unaware that Milligan was suspended for overdrawing his trust account and using client funds before settlement funds had been deposited in his trust account.

One of Milligan's former clients, Norman Ray Seiver, testified that during the time he was represented by Milligan, Milligan had shown him compassion and had been truthful. He also stated that he would retain Milligan as an attorney if he is reinstated. However, Seiver did not know the reasons for Milligan's suspension and has only seen Milligan twice since he was suspended. Seiver did not describe any specific facts or circumstances showing Milligan's rehabilitation or remorse

since suspension.

Richard Hollow, an attorney who over the years has had interaction with Milligan as adversary counsel in various lawsuits, testified that Milligan was always truthful with him. However, Hollow was unaware of any of the facts that gave rise to Millgan's suspension, had only seen Milligan four or five times since Milligan was suspended and did not provide any specific facts or circumstances showing Milligan's rehabilitation or remorse during that time.

Gary Prince, another attorney who has interacted with Milligan on a professional basis, testified that Milligan was "always straightforward, always honest." Although Prince attested that he never discussed the specifics of the suspension with Milligan and was unaware of the facts leading to the suspension, he believes that Milligan has "learned," based upon a conversation he had with Milligan in a grocery store parking lot. He described the conversation as lasting only a couple of minutes and admitted that he and Milligan did not discuss the specifics of the suspension. Prince maintained that his assessment of Milligan was based upon "instinct." "I could just tell he had been humbled and he was ready to get back to it. And I felt, you know, he learned. It is something I really can't touch on. It is just an instinct." This testimony, arising out of Prince's sole encounter with Milligan since Milligan's suspension, fails to describe any specific facts or circumstances showing that Milligan has experienced remorse or rehabilitation.

Finally, retired Knox County Chancellor Frederick McDonald, in whose courtroom Milligan had tried cases prior to his suspension, attested that Milligan was "always open and honest with the Court" and that Milligan " did a very good job of representing his clients." However, McDonald was not even aware that Milligan had been suspended for two years until called upon to testify before the Panel, was unaware of the reasons for the suspension, and had had no interaction with Milligan since the suspension. Like the other witnesses, McDonald did not describe any specific facts or circumstances showing that Milligan has experienced remorse or rehabilitation since his suspension.

Milligan testified on his own behalf that he "feel[s] remorse for the mistakes [he] made" and admits that he "did wrong" and that his actions were "stupid" and "a mistake." Milligan also testified in support of his assertion that he is now rehabilitated, stating that he "will never do anything again to harm the integrity of this profession that [he] loves so much." While statements like this do indeed constitute professions of remorse and rehabilitation, they are conclusory and do not meet the requirement that the petitioning attorney present proof of specific facts and circumstances showing remorse and rehabilitation during his or her period of suspension. Furthermore, Milligan is the interested party in this case and absent corroboration by other evidence in the case, the Panel could have reasonably concluded that his testimony did not constitute clear and convincing evidence of his moral character. See 32A C.J.S. Evidence § 1633 (2008) ("The uncorroborated testimony of an interested witness is not binding, and the trier of facts may disbelieve such testimony.").

Milligan contends that additional evidence of his rehabilitation was before the Panel. In this regard, Milligan references the five-year period he practiced law pending disposition of the two

disciplinary complaints filed against him on November 30, 1999, and April 25, 2000. Milligan testified that his rehabilitation actually started when, during this period, he upgraded his law firm's computer software. In determining the proper amount of evidentiary weight to assign to Milligan's efforts in improving his financial procedures, we believe it is proper to bear in mind that during the period of time these changes were implemented, Milligan's continued practice of law was subject to certain conditions created by this Court. These conditions required that Milligan retain accountant Terry Hall to oversee his law firm's finances, that a new client trust account be established under Hall's supervision by June 15, 2000, and that Hall review the settlement and disbursement summary for each case settled by Milligan's firm and approve all disbursements in order for them to be paid. Milligan's employee, Chrissy Stephens, was designated to serve as primary contact between Hall and the Board. Finally, our order required that Milligan retain fraud examiner Leroy Bible to review his firm accounts, including the client trust accounts. All three of these individuals - Hall, Stephens, and Bible - were ordered to immediately report any impropriety of which they became aware to the Board's disciplinary counsel. The fact that Milligan made rehabilitative efforts under these court-imposed conditions does not of itself constitute clear and convincing evidence of Milligan's personal rehabilitation, and the question remains whether he would have implemented the changes absent such close scrutiny and left to his own devices. Furthermore, these changes were implemented before Milligan's suspension in June of 2005, and, therefore, do not pertain to his rehabilitation after that time. And perhaps most importantly, none of these changes to Milligan's accounting procedures constitute proof of rehabilitation as to his forgery of his clients' signatures or his willingness to involve one of his employees in a scheme to present the signatures as genuine by having her falsely notarize them.

The record shows that Milligan ensured that no one lost any money as a result of his disciplinary offenses and that he is making payments of costs and expenses due the Board in this case. We have held that such conduct constitutes evidence of good faith, and it is therefore relevant to the issue of a petitioning attorney's moral character. See Hughes, 259 S.W.3d at 644 (holding that attorney's payment of all court costs, restitution to former clients and adoption of payment schedule for payment of a court-imposed fine qualify as expressions of good faith on the issue of character). However, we do not believe, given the inadequacy of proof otherwise, that these actions were sufficient to meet the burden of proof that Milligan bears in this case on the issue of his moral character.

As we have stated, the standard governing our review of this matter prohibits us from substituting our judgment for that of the Panel as to the weight of the evidence on questions of fact, and we must affirm the trial court's decision affirming the Panel's decision if we find substantial and material supporting evidence. Upon our careful review of the record, we simply cannot agree that the Panel erred in finding that Milligan failed to produce clear and convincing evidence that he meets the moral qualifications to practice law in this state. We emphasize that in so ruling we do not state that Milligan does not possess the requisite moral character to practice law, but only that the Panel's decision that he failed to meet his burden of proof was based upon a course of reasoning or judgment and did not disregard facts or circumstances in the case without some basis that would lead a reasonable person to the same conclusion.

17

**Legal Competency**

Section 19.3 of Supreme Court Rule 9 also requires that an attorney petitioning for reinstatement present clear and convincing evidence that he or she has the "competency and learning required for admission to practice law in this state." The Panel's decision that Milligan met this requirement by clear and convincing evidence and the trial court's affirmation of that decision are not challenged by the Board. Accordingly, the question of Milligan's competency and learning is not an issue before this Court.

**Effect of Reinstatement on the Integrity and
Standing of the Bar and Administration of
Justice and the Public Interest**

The final prerequisite for reinstatement is that the petitioning attorney present clear and convincing evidence that his or her resumption of the practice of law will not be "detrimental to the integrity and standing of the bar or the administration of justice, or subversive to the public interest." Tenn. Sup. Ct. R. 9, § 19.3. What little evidence Milligan presented in this regard consisted of conclusory statements from those witnesses who testified in his behalf with respect to the question of his moral qualifications. Given the conclusory nature of these statements and the minimal interaction between these witnesses and Milligan, it is our determination that Milligan also failed to meet his burden of proof as to this factor. Accordingly, we hold that the Panel and the Chancery Court did not err in finding that Milligan's reinstatement should be denied for failure to satisfy the third criterion of section 19.3.

**Conclusion**

For the reasons stated herein, we agree with the conclusions of the Panel and the trial court that Milligan failed to prove by clear and convincing evidence that he has the moral qualifications to practice law in this state and that his reinstatement to the practice of law would not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive to the public interest. Accordingly, we affirm the judgment of the trial court affirming the Panel's denial of Milligan's petition for reinstatement. Costs are assessed to James L. Milligan, Jr., for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE