IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 20, 2013 Session

**JEFF and MELISSA FITZPATRICK v. STATE OF TENNESSEE
DEPARTMENT OF CHILDREN'S SERVICES**

**Direct Appeal from the Chancery Court for Putnam County
No. 2012-202      Ronald Thurman, Chancellor**

**No. M2013-00823-COA-R3-CV - Filed March 18, 2014**

The petitioners are foster parents who were indicated by the Department of Children's Services as perpetrators of child neglect for "lack of supervision" and also for "environmental neglect." The lack of supervision allegation arose out of an incident in which a foster child who was placed in the petitioners' home was found fondling the private parts of a younger foster sibling on two occasions during the same evening. The environmental neglect allegation was due to the condition of the petitioners' home when the DCS investigator arrived to look into the report of child-on-child sexual abuse. The petitioners requested an administrative hearing. After a four-day contested case hearing before an administrative law judge, the indication for environmental neglect was deemed unfounded, but the indication for lack of supervision was upheld. The petitioners filed a petition for judicial review in chancery court, and upon reviewing the record, the court upheld the indication for lack of supervision. The petitioners appeal to this Court, arguing that there is no substantial and material evidence to support their indication for lack of supervision, that they have been denied procedural and substantive due process, and that they are entitled to an award of attorney's fees incurred in defending against the allegation of environmental neglect that was deemed unfounded, as well as the allegation of lack of supervision. For the following reasons, we affirm the decision of the chancery court in part, and we reverse in part and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed
in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Melanie Lane, Jamestown, Tennessee, for the appellants, Jeff and Melissa Fitzpatrick

Robert E. Cooper, Jr, Attorney General and Reporter, Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee Department of Children's Services

## OPINION

### I. FACTS & PROCEDURAL HISTORY

In September of 2009, the Department of Children's Services ("DCS") placed six foster children in the home of foster parents Jeff and Melissa Fitzpatrick. The six children were siblings. At the time of the placement, the youngest of the six foster children was a newborn baby, and the oldest foster child was about 9 years old. The oldest child was removed from the Fitzpatricks' home at some point due to behavioral issues that posed a threat to the younger children, so five foster children remained in the Fitzpatrick home thereafter. The Fitzpatricks also had two daughters of their own who lived with them.

The incident that gave rise to these proceedings occurred on May 9, 2011, after the foster children had been in the Fitzpatrick home for about twenty months. The Fitzpatricks had sent the children to their bedrooms, on the third level of the Fitzpatrick home, for "quiet time" before bed. At around 8:00 or 8:15 p.m., Mr. and Mrs. Fitzpatrick were on the first level of the home watching television, when Mr. Fitzpatrick heard a noise from upstairs. He went to third level of the home, to the bedroom that was shared by two of the foster children, seven-year-old male SR and three-year-old male IR. Mr. Fitzpatrick found both boys on the bottom bunk bed, which was the bunk belonging to three-year-old IR, and SR had his hands down IR's pants. Mr. Fitzpatrick reportedly "got onto" the boys and told them to stop, he instructed them to get into their own beds, and then he went back downstairs. Mr. Fitzpatrick told his wife about what he had witnessed, and the Fitzpatricks decided to call the children's DCS case manager the next morning. The Fitzpatricks continued to watch television on the first level of the home until shortly after 10:00 p.m. The Fitzpatricks then went to their bedroom on the second level of the home to get ready for bed. They heard another noise coming from the third level at that time, and Mr. Fitzpatrick went to investigate. The lights were off in the boys' room, but the television was on, and the boys were engaged in the same behavior. Mrs. Fitzpatrick heard Mr. Fitzpatrick yell at the boys, and she immediately ran upstairs to the boys' room, where she saw both boys on the bottom bunk bed, and SR was taking his hands out of IR's pants. Mr. Fitzpatrick scolded the boys again and instructed them to get into their own beds, to keep their hands to themselves, and to go to sleep, and he warned that he had better not see such behavior again or hear another noise coming from the room. The Fitzpatricks then returned to their bedroom on the second level and discussed the

-2-

situation. They agreed to call the DCS case manager the next morning.

At 7:44 a.m. the following morning, May 10, Mrs. Fitzpatrick called the children's DCS case manager, Marcia King, to report the incident. Ms. King came to the Fitzpatrick home that afternoon to discuss the implementation of a "safety plan" that required constant visual observation of either SR or the remaining children in the home and required that SR sleep in a room by himself. It was agreed that IR would sleep in the Fitzpatricks' bedroom on a loveseat for the time-being. The safety plan also required that a motion detector be placed outside of SR's room in order to alert the Fitzpatricks if SR left his bedroom.

Two days later, on the afternoon of May 12, a case manager with the DCS Special Investigations Unit[1], Eunice Leckey, and a detective from the local sheriff's department, Roger Cooper, went to the Fitzpatricks' home to investigate the report due to the allegation of child-on-child sexual abuse. Mrs. Fitzpatrick was casually interviewed for forty-five minutes to an hour, and the parties discussed the possibility of placing SR in respite care in another home. Ms. Leckey then stated that she needed to observe the rest of the Fitzpatricks' residence, so the Fitzpatricks led the investigators on a walkthrough of the home. The first floor of the residence, where the interview had taken place, was neat, clean, and organized; however, Ms. Leckey and Detective Cooper were somewhat concerned that an unloaded Russian assault rifle was sitting in the living area leaned against the fireplace. The second floor, where the Fitzpatricks' bedroom was located, was somewhat "more disorganized" and "cluttered." The youngest foster child, who was twenty months old at the time, regularly slept in a playpen in the study/exercise room on the second floor, and the investigators observed cat feces inside the playpen on the baby's bedding. There was also a stack of books on top of a gun safe that was adjacent to the playpen, which Ms. Leckey feared could fall onto the baby, and there were items on the floor in the room that Ms. Leckey perceived as hazardous to a baby. The third floor of the home consisted of one large bathroom and four bedrooms. As previously mentioned, the two male foster children, ages three and seven, shared one bedroom. The two female foster children, ages four and nine, shared another bedroom. The Fitzpatricks' youngest daughter, age six, had her own bedroom on the third floor, although she never slept in the room and instead slept on a couch in her parents' bedroom. The Fitzpatricks' other daughter who lived in the home, Megan, was eighteen or nineteen years old at the time, and she also had her own room on the third floor. The door to Megan's bedroom had a keypad lock, and she often slept on the couch on the first level of the home.

---

[1] According to the testimony at the hearing in this case, Child Protective Services handles child abuse allegations involving the general public, while the Special Investigations Unit handles child abuse allegations involving foster homes and group homes.

There was a noticeable temperature difference on the third floor, and the Fitzpatricks told the investigators that the upstairs air conditioning unit was not working. According to the investigators, the third floor was "much messier," "very disorganized," and "unkempt," and basically, "[e]verything was on the floor." They observed broken furniture, a large glass-framed print lying in the floor in the foster girls' bedroom, no sheets on most of the beds, dirty clothes and toys covering the floors, dirty underwear on furniture, nothing folded in the drawers and little to no clothing hanging in the children's closets. There was also cat feces on the bed in the room that belonged to the Fitzpatricks' six-year-old daughter. The upstairs bathroom was described as "nasty" and "not cleaned," although a bottle of ammonia and several other types of cleaning products were within reach of children, either on low shelves, on the floor, or on the toilet. There were children's clothes covering the bathroom floor. The trash can was overturned, with trash falling out onto the floor. According to Ms. Leckey, the bathroom sink had accumulated "miscellaneous crud over time" that she could not identify, but it looked as if "stuff" had just "spilled out." Ms. Leckey took numerous photographs of the conditions that she observed.

At the conclusion of the walkthrough, Ms. Leckey and Detective Cooper stepped outside to discuss the situation with another DCS employee, Milissa Hill, who had arrived at the Fitzpatrick home during the interview. After about an hour, they went back inside and informed the Fitzpatricks that the children were going to be removed from the home immediately and placed into respite care so that the investigation could continue. The children were removed from the Fitzpatricks' home that same day.

The investigation progressed in the days that followed. All of the children in the home (except the baby) were interviewed at a child advocacy center. SR denied touching IR inappropriately, but IR disclosed that SR had touched him two times on his penis while he was at the Fitzpatrick home. IR said that Mr. Fitzpatrick had seen this happen and had told them not to do that. DCS personnel made at least two follow-up visits to the Fitzpatricks' home. Ms. Leckey asked to interview Mr. Fitzpatrick, but he declined, stating that he had been advised by a foster parent advocate not to speak to Ms. Leckey without an advocate present. However, Mr. Fitzpatrick was interviewed by Detective Cooper. Ms. Leckey contacted SR's school system and his counselor, and she conducted follow-up interviews of the DCS case manager and the resource parent support worker assigned to the case. She also attempted to interview Megan Fitzpatrick and the Fitzpatricks' housekeeper, but her telephone calls were not returned.

On May 18, 2011, Ms. Leckey telephoned Mrs. Fitzpatrick and informed her that she and her husband were being "indicated" by DCS for lack of supervision and for

environmental neglect.[2] The Fitzpatricks requested a formal file review of the decision.[3] On December 19, 2011, the Fitzpatricks received a letter informing them that DCS had completed an emergency file review of the investigation and had upheld the validity of the indication. The letter also informed the Fitzpatricks that they had a right to a hearing before an administrative judge, at which they could present evidence on their behalf in order to dispute the finding that they had committed child abuse. The Fitzpatricks filed their request for an administrative hearing on December 26, 2011.

A contested case hearing was held before an administrative law judge on March 13, 14, and 15, and April 9, 2012.[4] Mrs. Fitzpatrick testified that she worked as the director of a preschool. She held a bachelor's degree in secondary education and was attending classes to obtain a secondary degree in what she described as "early childhood." She testified that she and her husband had been foster parents for nine to ten years and that DCS had placed twenty to twenty-five foster children in the Fitzpatrick home during that time.

Mrs. Fitzpatrick testified that the six foster children at issue had displayed numerous behavioral problems after being placed in their home, and that SR had exhibited sexual behavioral problems on several occasions prior to the May 9, 2011 incident that led to the foster children's removal from the home. Mrs. Fitzpatrick explained that when SR was in kindergarten, in 2010, he exposed himself to other children on the playground. SR's teacher called Mrs. Fitzpatrick to inform her of the incident, and Mrs. Fitzpatrick had a talk with SR and explained that such behavior was not acceptable. Mrs. Fitzpatrick testified that she also reported the incident to the DCS case manager for the foster children, who stated that she

---

[2] Tennessee Code Annotated section 37-1-406 requires DCS to investigate reports of child abuse and child sexual abuse and to determine, within sixty days, "whether the reported abuse was indicated or unfounded and report its findings to the department's abuse registry." Tenn. Code Ann. § 37-1-406(a), (i). A report made against an alleged perpetrator is "classified as 'indicated' if the preponderance of the evidence, in light of the entire record, proves that the individual committed abuse, severe child abuse, child sexual abuse, or neglect." Tenn. Comp. R. & Regs. 0250-07-09-.06(1). Accordingly, the term "indicated" is defined as "the classification assigned to an individual found to be a perpetrator of abuse, severe child abuse, child sexual abuse, or neglect as the result of investigation of a report of abuse." Tenn. Comp. R. & Regs. 0250-07-09-.01(9).

[3] An individual who has been "indicated" as the perpetrator of abuse or neglect "may request a formal file review by the Commissioner's designee to determine whether the report has been properly classified as 'indicated.'" Tenn. Comp. R. & Regs. 0250-07-09-.07.

[4] The cases against Mr. Fitzpatrick and Mrs. Fitzpatrick had separate docket numbers, but counsel for DCS and counsel for the Fitzpatricks agreed prior to the hearing that the matters would be consolidated for hearing. The administrative law judge acknowledged the parties' agreement at the beginning of the hearing.

would arrange for SR to receive counseling. At some point thereafter, SR's kindergarten teacher called and informed Mrs. Fitzpatrick that SR had exposed himself again. Mrs. Fitzpatrick again discussed the issue with SR and reported the incident to his case manager. The case manager stated that she was still trying to arrange for counseling for SR. According to Mrs. Fitzpatrick, the case manager did not offer any advice about how to handle the behavior.

The next incident occurred after SR completed kindergarten, when he was attending a summer program at the local elementary school. Mrs. Fitzpatrick testified that during an outing to a nearby swimming pool, SR had reportedly "reached up under" a little girl's bathing suit as she climbed a pool ladder and "fondled her private parts." The head of the summer program telephoned Mrs. Fitzpatrick to inform her about the incident, and Mrs. Fitzpatrick contacted the children's case manager again to report the behavior. By this time, SR was attending counseling sessions about three times per month, and the case manager stated that she would inform SR's counselor about the incident.[5] According to Mrs. Fitzpatrick, the case manager also advised her to instruct SR to keep his hands to himself and to explain that it is not acceptable to touch other people's private parts.

A new case manager, Marcia King, was assigned to the children's case in July of 2010. Mrs. Fitzpatrick testified that she informed Ms. King that she did not think that SR's counseling was "working out," that she thought he needed a different counselor, and that she perceived SR's behavioral problems to be "intensifying." Mrs. Fitzpatrick informed Ms. King that SR had issues with lying and stealing and had beaten the family dog and cat, and Ms. King agreed that SR needed more "in depth" counseling.

The following spring, in late April of 2011, an incident occurred involving SR, who was then seven years old, and his younger brother IR, who was three years old. According to Mrs. Fitzpatrick, her husband found the two boys in the bedroom they shared, lying on a bunk bed, fully clothed, and SR was bent over IR with his mouth over IR's private parts (over his clothing). Mrs. Fitzpatrick telephoned the children's case manager, Ms. King. According to Mrs. Fitzpatrick, she told Ms. King that Mr. Fitzpatrick had found the boys lying on a bed with SR's mouth over IR's private parts, through his clothing, and she informed Ms. King that she was very concerned about SR's behavior and the apparent ineffectiveness of his counseling sessions.[6] Nonetheless, according to Mrs. Fitzpatrick, when

---

[5] Mrs. Fitzpatrick testified that SR began attending counseling sessions "at least" by May of 2010.

[6] As we will discuss later in this opinion, Ms. King acknowledged that Mrs. Fitzpatrick reported an
(continued...)

she reported the "face to crotch" incident to Ms. King, Ms. King assured her that some sexual exploration was normal with children and said that she would bring Mrs. Fitzpatrick a booklet to read that would make her feel better. Ms. King brought the booklet to Mrs. Fitzpatrick later that day and instructed her to again talk with SR about personal space. Mrs. Fitzpatrick testified that she read the first eleven to twelve pages of the 72-page booklet but did not finish it because she was busy with final exams for the college courses she was taking, and also, her mother-in-law was very ill at the time. At the very beginning of the booklet, it listed four examples of children demonstrating sexual behavior, and Mrs. Fitzpatrick testified that she found one of the examples comparable to what she had observed with SR and IR. The example described two brothers, ages seven and nine, who were discovered in their bedroom touching each other's private parts; the boys were embarrassed and said that they were getting dressed and wondered what it would be like to touch each other. The booklet stated that "normal sexual play" among children was different from "problematic sexual behaviors." It classified the incident involving the two brothers as "sex play," noting that the brothers were "about the same age," not upset or angry but curious, the incident was not planned and happened when the boys were changing clothes, and neither child was pressured into the behavior. Mrs. Fitzpatrick testified that she found the situation with SR and IR comparable because it involved brothers, there was no physical violence, and neither child was upset. Mrs. Fitzpatrick testified that she "personally did not agree" with the booklet's suggestion that such behavior was not a cause for concern, but, she added, "They were the experts; I wasn't." Mrs. Fitzpatrick testified that she had a talk with SR about keeping his hands to himself and instructed him, again, not to touch other people's private areas.

Mrs. Fitzpatrick also testified about the May 9, 2011 incident that led to the children's removal. She explained that she and her husband were on the first floor of the home, and that the children had been sent upstairs for "quiet time" before bed.[7] Around 8:00 p.m., Mr. Fitzpatrick heard a sound from upstairs and went to investigate, then returned about five minutes later and said, "You won't believe what I just saw." He said he had found SR in IR's bed with his hands down IR's pants. Mrs. Fitzpatrick said she responded, "That's not O.K." According to Mrs. Fitzpatrick, she and her husband sat there "dumbfounded" for a moment, then she told her husband that Ms. King had given her a booklet containing

---

[6](...continued)
incident in April 2011 involving the boys being in a suggestive position, but she insisted that she was not told that SR had his mouth over IR's genitals during the incident.

[7] Mrs. Fitzpatrick said that she generally sent the children upstairs for "quiet time" around 8:00 p.m., and that "sometimes" she and Mr. Fitzpatrick would go upstairs to check on the children and "tuck everybody in" around 9:00 p.m. She said the children were sometimes asleep by that time, and sometimes not, but that the children were almost always asleep by 9:30 or 10:00 p.m.

examples of child sexual behavior which suggested that some sexual exploration is normal. Mrs. Fitzpatrick testified that her husband then said, "You think?" and she responded, "Well, no, not really, but I don't know what to do." She said they agreed to call Ms. King the next morning, then they sat and talked for a while and continued to watch television.

Mrs. Fitzpatrick testified that she and her husband went upstairs to get ready for bed shortly after 10:00 p.m., and when she reached her bedroom door on the second level, she heard "a thump or something" from the third floor. Mr. Fitzpatrick said he would go and investigate, so Mrs. Fitzpatrick proceeded to the master bedroom. Mrs. Fitzpatrick testified that she heard Mr. Fitzpatrick yell "Stop it!" so she immediately ran upstairs, where she saw the boys on the bottom bunk, facing each other with their legs spread, and SR was removing his hands from IR's pants. Mrs. Fitzpatrick testified that "there were no words" so she "just stood there." Mr. Fitzpatrick told SR "this is not O.K." and instructed him to get into his bunk, to keep his hands to himself, and to cover up because it was time to go to sleep. According to Mrs. Fitzpatrick, Mr. Fitzpatrick told the boys that he was turning off the light and the television and said that he had better not hear another noise or "see this" behavior again. Mrs. Fitzpatrick testified that she and her husband went back downstairs to their bedroom and discussed what to do, and her husband said, "I don't care what that book said, this is not O.K." Mrs. Fitzpatrick said, "I don't know what to do tonight," and stated that she would call Ms. King "the first thing in the morning." Mrs. Fitzpatrick testified that she then got a pillow and a blanket, went upstairs, and sat in a chair in the hall, directly in the boys' doorway, for the remainder of the night, because she "[didn't] know anything else to do." Mrs. Fitzpatrick said she sat in the chair awake all night so that she could see the full length of the boys' beds and SR could not get out of his bed without her knowledge.

Mrs. Fitzpatrick conceded that her six-year-old daughter had a bedroom on the third level of the home that she used "to play only," and that her daughter had not slept in the bedroom since she was three years old because she slept on the couch in the master bedroom "every night." In addition, the bedroom belonging to the Fitzpatricks' older daughter, Megan, was empty on the night of the incident because Megan slept on the couch on the first level of the home, as she often did. Mrs. Fitzpatrick was asked why she did not separate the boys after finding SR with his hands in IR's pants, and she said she did not think she was "allowed to" move either child out of his bed because DCS had told her repeatedly that the foster children had to have their own beds. However, Mrs. Fitzpatrick later admitted to telling Ms. Leckey, during the May 12 interview at her home, that she should have separated the boys but that she "just didn't think to do that" at the time. At the hearing, Mrs. Fitzpatrick explained that she did not expect SR to repeat the same behavior that very night. She said, "It was just unthinkable to me." Mrs. Fitzpatrick referenced the booklet which suggested that some exploration was normal and stated, "Well, they had explored. They were done; I never expected them to do it again." She claimed that the booklet had affected the

way she responded to the incident. Mrs. Fitzpatrick also testified that despite the previous behavioral issues she had reported to the DCS case manager, she had never been advised to keep SR separate from the other children. Mrs. Fitzpatrick acknowledged the distance between the first floor living area where she and Mr. Fitzpatrick were watching television and the third floor where the children's bedrooms were located, but she claimed that one can hear sounds from the first floor, stating, "You can actually hear the kids talking up there. If it is quiet upstairs and there is nothing going on, you can hear their conversation up there with no problem – as long as they are not whispering. If they are sitting there talking like I'm talking right now in this kind of voice you might not can hear every single word but you can get the whole gist of a conversation."

Mrs. Fitzpatrick testified that she did not attempt to call DCS on the evening of May 9 because "[i]t was night." Mrs. Fitzpatrick said that when she had attempted to call her case manager, Ms. King, on a previous occasion after-hours, Ms. King did not answer, and Ms. King later told her that she turned off her cell phone when she was not working. As a result, Mrs. Fitzpatrick claimed that she did not know how to get in touch with Ms. King after-hours. Mrs. Fitzpatrick said she was not aware that DCS had an "on-call" telephone number because no one had ever mentioned it to her. She later identified one of the six placement contracts she executed when the six foster children were placed in the Fitzpatrick home, and the signature page listed an "after hours" telephone number; however, Mrs. Fitzpatrick testified that she was never made aware of the number. In summary, Mrs. Fitzpatrick said, "I did not know I could get hold of DCS until the next day." Mrs. Fitzpatrick said she did not call the police after the incidents because the offending child was only seven years old, and she did not think it was appropriate to call the police on a seven-year-old child. Mrs. Fitzpatrick acknowledged that she had the telephone number for a child abuse hotline in her office at the preschool where she worked, but she said she associated that with daycare issues, not foster care issues.

Mrs. Fitzpatrick conceded that when she called Ms. King the next morning to tell her about the incident, she did not inform Ms. King that she had stayed up all night watching the boys. She also conceded that she did not tell Ms. Leckey or Detective Cooper, when they came to investigate on May 12, or during their conversations in the days that followed, that she had stayed up all night watching the boys. Mrs. Fitzpatrick said she thought that Ms. Leckey was there to get help for SR because she said she was investigating the allegation of child-on-child sexual abuse. According to Mrs. Fitzpatrick, Ms. Leckey said, "Tell me about the incidents with the boys beginning with the most recent and going backwards," so that is what Mrs. Fitzpatrick attempted to do. Mrs. Fitzpatrick said she inadvertently failed to mention the "face to crotch" incident to Ms. Leckey, which had occurred just a couple of weeks earlier, in late April, but she did tell Ms. Leckey about the two incidents on the evening of May 9, the two incidents of SR exposing himself in kindergarten, and the incident

where he touched the little girl at the swimming pool the previous summer. Mrs. Fitzpatrick said she had no explanation for why she forgot to mention the "face to crotch" incident other than that she was upset and did not think of it. Regarding the failure to inform Ms. Leckey about staying up all night to watch the boys, Mrs. Fitzpatrick said it "never occurred to [her]" to tell Ms. Leckey everything that *she* had done on the evening of May 9 because she did not know at the time that she was under suspicion. Mrs. Fitzpatrick said she learned sometime in June 2011 that DCS "believed" that the boys had been left alone again after the second incident. She said that this realization came sometime around the date of a hearing regarding the foster children's removal from the home.[8] Specifically, Mrs. Fitzpatrick recalled hearing Ms. Leckey testify at the removal hearing, on June 21, 2011, that her issue of concern was that the boys had been left alone twice on the evening of May 9 – the first time for a couple of hours and then again for the rest of the night – after SR was found sexually touching IR. Mrs. Fitzpatrick testified that during that same month, she saw one of the DCS employees, Ms. Hill, at a local retail store, and the two casually discussed the situation with the foster children. According to Mrs. Fitzpatrick, she told Ms. Hill at that time that she did not understand why the children were removed from her home, and she mentioned to Ms. Hill that the children were not left alone overnight, as she had sat in the doorway all night after the second incident.

Mrs. Fitzpatrick also testified about the condition of her home as it related to the allegation of environmental neglect. Mrs. Fitzpatrick testified that she had a housekeeper who generally cleaned the first level of the home once every couple of weeks, and that the housekeeper actually came earlier in the day on May 12, the day of the walkthrough with Ms. Leckey and Detective Cooper. Mrs. Fitzpatrick said that she had left a note asking the housekeeper to clean the second and third level of the home as well, but the note apparently was not seen. Still, Mrs. Fitzpatrick claimed that she had thoroughly cleaned the house on the Saturday before the Thursday walkthrough. She testified regarding the specific conditions that were observed by the investigators and offered an explanation for each. Mrs. Fitzpatrick said that the foster children did not like bed sheets, because they apparently did not use them in their previous home, and she claimed that they regularly pulled everything off of their beds. Mrs. Fitzpatrick said she would put the sheets back on the beds not every night but "almost every other night." She claimed that there were no sheets on the bed belonging to her six-year-old daughter because she had pulled them off the day before the walkthrough in order to make a bed for a doll. Mrs. Fitzpatrick testified that she had folded the children's laundry and placed it in drawers the previous Saturday, but that the children had moved and shuffled everything when getting dressed for school. She claimed that the "dirty underwear" the investigators saw lying on furniture were not really dirty but were

---

[8] The foster care removal hearing was a separate proceeding from the indication proceeding that is being reviewed on appeal.

-10-

simply stained from prior use. Mrs. Fitzpatrick testified that the broken dresser in the girls' bedroom had been broken "one night that week," and that the broken crib located in the boys' room had been broken just a couple of weeks earlier. She testified that the framed art print had been hanging on the wall the previous Saturday when she cleaned. She claimed that the foster boys could mess up their bedroom, to the condition shown in the photographs, in twenty minutes or less. Regarding the cat feces, Mrs. Fitzpatrick testified that she had gone into the six-year-old daughter's bedroom just that morning and that the feces was not present at that time. She said they had a new cat at the time, which had been in their home for only one to two weeks prior to the walkthrough, and she suggested that the new cat was responsible for the feces on the bed and in the playpen. Mrs. Fitzpatrick claimed that she had never once seen that cat, or any other pet, defecate in the house outside of the litter box, and she gave the new cat away on the day after the walkthrough.

Mrs. Fitzpatrick claimed that the upstairs bathroom was used exclusively by Megan, and that the foster children had "absolutely no access" to the bathroom. Mrs. Fitzpatrick said when the children arrived in the home, they had problems with using the toilet correctly and would often make messes, so "within the first month" she locked the two doors to the upstairs bathroom and required that the children only use the bathroom located on the first level of the home. She claimed that the baskets of baby clothes in the upstairs bathroom consisted of clothing that the children had outgrown, and that the "children's clothing" on the floor, described by the investigators, actually belonged to Megan. Mrs. Fitzpatrick claimed that the two doors to the upstairs bathroom were left open and unlocked on the day of the walkthrough because she had asked Megan to leave them open for the heating and cooling lady who was coming to check the air conditioner. Mrs. Fitzpatrick said she did not inform Ms. Leckey that the bathroom doors were always locked because she did not know that it was relevant. Mrs. Fitzpatrick testified that the bathroom doors were open during previous inspections at the home because she had always unlocked them prior to the arrival of DCS employees so that the room would be ready for inspection. Mrs. Fitzpatrick admitted that the bathroom "needed a lot of attention" on the day of the walkthrough, but she claimed the mess was solely attributable to Megan. Mrs. Fitzpatrick said that the ammonia and cleaning bottles were usually kept on the top shelf of the bathroom closet and that Megan must have left them within reach of children.

Megan Fitzpatrick testified as well. She likewise stated that the doors to the upstairs bathroom were always locked and that the children only used the bathroom on the first level of the home. She claimed that the cleaning chemicals were left out in the open and accessible on the day of the walkthrough because she had gotten them out just that morning, intending to clean the bathroom, and she was unexpectedly called into work. Megan testified that she had never seen pet feces in the home on any occasion. She testified that she did not agree to be interviewed by Ms. Leckey during the DCS investigation because she was scared.

Megan testified that she had only discussed the incident of SR's sexual behavior with her parents on one occasion, but when she did, her mother told her that she had sat outside the boys' bedroom for the remainder of the night. The Fitzpatricks' other adult daughter, Bethany, testified as well. She basically corroborated Mrs. Fitzpatricks' testimony that the upstairs bathroom was always locked and said that she had never seen animal feces in the Fitzpatricks' home.

The other witnesses who were called to testify included nine employees of DCS, and Detective Roger Cooper.[9] Marcia King, the family service worker who was assigned to the children's case in July of 2010, testified about her involvement with the children and the Fitzpatricks. She had been the children's case manager for ten months at the time of the May 9, 2011 incident that led to the children's removal from the home. Ms. King testified that prior to the May 9 incident, she had never been beyond the first level of the Fitzpatricks' home. Ms. King testified that the Fitzpatricks were always cooperative and proactive in trying to care for the foster children by addressing their physical and educational needs and trying to get counseling arranged for SR. Ms. King said that she did not believe that the Fitzpatricks pose a threat to children.

Ms. King testified that Mrs. Fitzpatrick called her on the morning of May 10 and was "very upset" about two incidents that had occurred the night before, during which the Fitzpatricks had discovered SR with his hands down IR's pants. As previously noted, it is undisputed that when Mrs. Fitzpatrick called Ms. King to tell her about the incident, she did not mention that she had stayed up all night watching the boys. According to Ms. King, Mrs. Fitzpatrick kept repeating, "I didn't know what to do because I know they had to have their own beds." Ms. King said she discussed with Mrs. Fitzpatrick that "this is probably one of those circumstances where you didn't worry about them having their own bed."[10] Ms. King said she did not specifically ask whether the Fitzpatricks had left the boys alone after the second incident, but she was under the impression that they did because Mrs. Fitzpatrick kept talking about the issue with the beds and the fact that she did not separate the boys. Ms.

---

[9] Mr. Fitzpatrick did not testify. He was scheduled to testify on the fourth and final day of the hearing, and we do not have a transcript of the proceedings from that date. However, the order entered by the administrative law judge states that Mr. Fitzpatrick was ill on the fourth day of trial and that he waived his right to testify through his attorney.

[10] It is undisputed that there were empty beds available, in other rooms, on the evening of May 9. However, Mrs. Fitzpatrick repeatedly referred to DCS's requirement that foster children have "their own" bed. We presume, then, that Mrs. Fitzpatrick must have been under the impression that each foster child had to have "their own" bed in the sense that a particular bed was assigned to him or her. At one point, Mrs. Fitzpatrick testified, "On the evening of May 9th I didn't think I could move him out of his bed. I thought he had to be in his own bed."

-12-

King's case recording notes from May 10, 2011, detailed the early morning call from Mrs. Fitzpatrick and stated that SR was found, during the first incident, with his hands down IR's pants "playing with his penis," and the second time, "again using his hand to rub IR's penis." According to the case recording, Mrs. Fitzpatrick also reported during this phone call that she had recently found a pocketknife and a butcher knife in SR's backpack.

Ms. King testified about SR's previous incidents of sexual behavior as well. Ms. King testified that she learned, during the investigation of the May 9 incident, that the reason that SR had been placed in counseling was because he had "tried to grab some little girl's butt at school."[11] She said she was not previously aware of this incident because it occurred when someone else was serving as case manager. She estimated that the "face to crotch" incident involving SR and IR had occurred a week and a half before the May 9, 2011 incidents. According to Ms. King, when Mrs. Fitzpatrick called her to report that incident, she was "very upset and concerned" and said that the boys had been found "in the same bed and both were dressed but they were in a position of face to crotch in the bed. They weren't touching, they weren't doing anything, but they were in what would be considered a suggestive position." According to Ms. King, Mrs. Fitzpatrick never told her that SR's mouth was over IR's genitals during the incident. Ms. King said she even discussed with Mrs. Fitzpatrick that "if it wasn't these children that we were dealing with you might not think anything about it," because they could have been playing a tickle game or something innocent, but "you automatically assume because of their history that it was something sexual."[12] Ms. King said she instructed Mrs. Fitzpatrick to do "safety training" with SR, and she provided Mrs. Fitzpatrick with some materials to read to teach her how to deal with children who are acting out sexually. She said she also began the process of trying to get SR into a more intensive counseling program for children with sexually reactive behaviors. Ms. King testified that she was not aware of anyone instructing Mrs. Fitzpatrick to keep SR away from the other children in the home prior to the May 9 incident. However, she testified that her reaction would have "definitely" been different if she had known that SR had his mouth over IR's genitals during the April incident. She said that such a report would have required an immediate referral and removal of SR from the home. However, Ms. King insisted that Mrs. Fitzpatrick never told her about SR's mouth being over IR's genitals, and added, "She told me that there was no touching. That was something that I had asked a couple of times and there was no touching."

---

[11] This incident was apparently the one that occurred at the swimming pool, as Mrs. Fitzpatrick later attempted to clarify that SR touched a little girl's "private parts" at school and not her "butt," as previously stated by a DCS employee.

[12] Ms. King testified that SR had been exposed to some adult sexual behavior in his biological home.

Eunice Leckey also testified. She was the case manager assigned to the Special Investigations Unit, who interviewed Mrs. Fitzpatrick and inspected the Fitzpatrick home on May 12, 2011. Ms. Leckey testified that she receives referrals in cases with allegations of abuse or neglect, and in this instance, she received a referral for child-on-child sexual abuse concerning two of the foster children in the Fitzpatrick home. Ms. Leckey testified that she contacted Detective Roger Cooper with the local sheriff's department because all investigations involving allegations of such abuse are coordinated with law enforcement. On May 12, Ms. Leckey and Detective Cooper went to SR's elementary school and met with his principal and teacher before observing SR and the other foster children who attended the school. Ms. Leckey and Detective Cooper then visited the preschool at which Mrs. Fitzpatrick serves as director, and there, they observed the younger foster children and spoke with Megan Fitzpatrick, who also worked at the preschool. Ms. Leckey made telephone contact with Mrs. Fitzpatrick, who was running an errand, and the two agreed to meet at the Fitzpatrick residence. Ms. Leckey testified that when she met Mrs. Fitzpatrick at the home, she explained that she was there to investigate an allegation of abuse and neglect "in the home," and she did not specifically state that Mrs. Fitzpatrick was being investigated personally. Ms. Leckey clarified that when she arrived at the home, she was not investigating any allegation of lack of supervision or environmental neglect against the Fitzpatricks, but simply the referral of child-on-child sexual abuse. She acknowledged, however, that the issue of lack of supervision is "always there" as an "underlying issue" in cases involving child-on-child abuse in a home. Ms. Leckey said she first realized that there were concerns regarding environmental neglect when she toured the home after the interview. Thus, these two allegations against the Fitzpatricks were added later based upon facts discovered during the investigation.

Ms. Leckey testified that she provided Mrs. Fitzpatrick with information about the availability of a foster parent advocate, and Mrs. Fitzpatrick agreed to speak to Ms. Leckey without the presence of an advocate and signed a document stating as such. Ms. Leckey then began to interview Mrs. Fitzpatrick on the first level of the home. Mr. Fitzpatrick arrived at some point during the course of the interview, and so did Milissa Hill, the resource parent support worker assigned to the Fitzpatricks, as she had a previously scheduled meeting with Mrs. Fitzpatrick set for that afternoon.

Ms. Leckey testified that Mrs. Fitzpatrick told her about the details of the May 9 incident during the interview. Mrs. Fitzpatrick said she and her husband were downstairs watching television, and around 8:00 p.m., he heard a noise from the third level, went upstairs, and discovered SR and IR on the lower bunk bed, facing each other, with SR's hands in IR's pants. Mr. Fitzpatrick reportedly talked to them about personal space and separated them into their own beds, and came back downstairs within five minutes. Mrs.

Fitzpatrick told Ms. Leckey that around 10:00 or 10:30, Mr. Fitzpatrick heard another noise from upstairs and went to investigate, and he found the boys doing the same thing. Mrs. Fitzpatrick said she went upstairs when she heard Mr. Fitzpatrick yell, and she saw the boys facing each other on the bottom bunk with their legs spread apart, and SR was removing his hands from IR's pants. They talked about personal space again, then they turned off the lights and went back to their room to discuss what to do.

Ms. Leckey testified that Mrs. Fitzpatrick did not mention anything else that she or her husband did in response to the incident. Mrs. Fitzpatrick told Ms. Leckey that she should have separated the boys but she did not. Regarding the Fitzpatricks' decision to continue watching television on the first level of the home after SR was found fondling IR at 8:00 p.m. on the third level of the home, Ms. Leckey testified, based upon her observation of the home, that there was no way that the Fitzpatricks could have adequately supervised the children from the first floor. Ms. Leckey clarified that the home did not have a continuous stairway from the first to the third level of the home; instead, there was one stairway leading from the first to the second level, and another stairway leading from a separate area of the second level up to the third level of the home.

Ms. Leckey recalled that on October 25, 2011, which was the third day of the hearing in the foster care removal case, Mrs. Fitzpatrick testified that she had stayed awake all night watching the boys on the evening of May 9. However, Ms. Leckey testified that she was not aware of this information being provided to DCS by any source prior to that date. Ms. Leckey testified that she personally did not believe Mrs. Fitzpatrick's claim that she stayed awake all night watching the boys because Mrs. Fitzpatrick never told her that fact when she was asked about the incident and discussed it during the interview. According to Ms. Leckey, Mrs. Fitzpatrick stated during her interview that after the second incident, she and Mr. Fitzpatrick went back downstairs to their bedroom to discuss what to do, but she never mentioned that she had stayed awake all night watching the boys, during her interview or other conversations with Ms. Leckey in the days after the incident. Ms. Leckey acknowledged that Mrs. Fitzpatrick never stated "directly" that the boys *were* left alone for the remainder of the night after the second incident, but she noted that Mrs. Fitzpatrick provided other specific details about what had occurred: the Fitzpatricks turned out the light and went back to their room to discuss the situation, they "didn't think to" separate the boys, and Ms. Fitzpatrick called Ms. King the next morning at precisely 7:44 a.m. Ms. Leckey said, "from the information I was given they didn't do anything else except go back to their room and discuss it and wait until the next morning to call."

Ms. Leckey also testified that, during the interview, Mrs. Fitzpatrick did not mention the "face to crotch" incident that had occurred just a week and a half prior to the May 9 incident. Ms. Leckey said that she learned about that incident from case manager Marcia

King, and throughout the course of Ms. Leckey's investigation, she found no indication that Mrs. Fitzpatrick had ever reported to DCS that SR had his mouth over IR's genitals.

Ms. Leckey also described the conditions of the Fitzpatrick home and identified the photographs that she had taken during the walkthrough, which were entered into evidence. She testified that after the interview, which was around 4:30 or 5:30 in the evening, she asked to do a walkthrough of the residence.[13] Ms. Leckey said that Mrs. Fitzpatrick asked if she really needed to do that, and Ms. Leckey responded that it was part of protocol. She testified that she did not specifically ask whether the children had access to the upstairs bathroom because the two doors to the bathroom were unlocked and open, the room was adjacent to the children's bedrooms and accessible to anyone who entered the third floor, and there were children's clothes plainly visible in the floor of the bathroom.

Ms. Leckey testified that she, and others, made the decision to indicate the Fitzpatricks based upon their entire investigation of the matter and the totality of the circumstances. Among other things, Ms. Leckey referred to the fact that the boys had been left alone "twice" after they were discovered engaging in sexual behavior. Ms. Leckey noted that after the first incident, Mr. Fitzpatrick basically walked out and left the boys alone. Ms. Leckey also acknowledged her previous testimony from the foster care removal hearing, when she testified that she had concluded that the Fitzpatricks had not properly supervised the boys on the evening of May 9 because "the [Fitzpatricks] had left the children two times within two hours all night unsupervised. Basically went in, told them to lay down, and walked back out[.]" Ms. Leckey again testified that the Fitzpatricks had basically found the boys engaged in sexual behavior "two different times," told them to get back in their beds, and left the room, despite having knowledge of SR's prior incidents of behavior. Ms. Leckey testified regarding a certain form that she had completed at the conclusion of her investigation, on which she stated that the foster children were removed from the home "due to lack of supervision by the foster parents" when they found SR sexually touching IR "two different times within a few hours and did nothing until the following morning except for tell the boys to get back in their own beds[.]" The administrative law judge asked Ms. Leckey a question specifically concerning the basis of her decision to indicate the Fitzpatricks, and Ms. Leckey responded, "It was basically the incident that occurred that night two times that they knew and from all information did not do anything other than tell the boys to get back in their beds and waited until the next morning to call."

---

[13] The children were not at the Fitzpatrick home during the interview. The Fitzpatricks' oldest daughter and her husband picked the children up from school that day and took them to their house until the interview was completed.

Detective Roger Cooper testified as well. He was employed by the local sheriff's department as an investigator of all crimes against children and all sex crimes. Detective Cooper testified about his involvement in the case and the steps that he took to investigate the matter. Among other things, he described his visit to the Fitzpatrick home on May 12 with Ms. Leckey. According to Detective Cooper, the interview of Mrs. Fitzpatrick was not a formal yes or no conversation, but rather, a casual interview where she was permitted to provide any information she desired. Detective Cooper testified that he spoke with Mr. Fitzpatrick on that day as well, but he did not actually interview Mr. Fitzpatrick until a later date. He described what Mr. Fitzpatrick had told him about the evening of May 9, which was consistent with the previous descriptions already provided in this opinion. Detective Cooper testified that after the walkthrough of the home with Ms. Leckey on May 12, Mr. Fitzpatrick told him that the home had been in that condition since the foster children arrived there.

Detective Cooper was asked during his testimony whether he thought the Fitzpatricks posed a threat to children, and he responded, "I don't believe that they should be indicated, no. Not to where Mrs. Fitzpatrick is going to lose her education and her ability to work around children." Nevertheless, Detective Cooper testified that based upon his observation of the home, it appeared that "there was a lack of supervision going on upstairs," and he questioned whether the children were "just doing whatever." For example, when asked if the children could mess up their rooms, to the point reflected in the photographs, within a few days, he said, "Maybe if they were turned loose and not looked after, maybe. To where there is adults not coming in and seeing this and saying, 'What is going on?'" Detective Cooper said he had a hard time believing that any adults who went upstairs and checked the children's rooms would allow the conditions he observed to continue. In sum, Detective Cooper testified that when they looked at the whole picture, they came to the conclusion that "something was not right here, whether the children were not being looked after properly, maybe too busy, I don't know. But something just wasn't right here."

Milissa Hill was the DCS resource parent support worker assigned to the family beginning in April of 2011, which was just prior to the May 9, 2011 incident that led to the children's removal from the home. She described her responsibilities as ensuring that foster homes have the resources they need to support foster children, ensuring that homes are in compliance with policies and procedures, and addressing issues that may exist when she enters the homes. Ms. Hill had her first scheduled monthly home visit with the Fitzpatricks on May 12, the day that Ms. Leckey and Detective Cooper went to the home to interview the Fitzpatricks in response to the report of child-on-child sexual abuse. Ms. Hill arrived for the home visit while the interview was being conducted, and she observed part of the interview and participated in a portion of the walkthrough. Ms. Hill testified that at some point thereafter, she happened to see Mrs. Fitzpatrick at a local store, and at that time, Mrs. Fitzpatrick mentioned to her that she had stayed awake all night watching the boys after the

second incident. However, Ms. Hill could not remember exactly when this conversation took place.

Emily Maxwell was the previous resource parent support worker for the Fitzpatricks, and she worked with them in that capacity from September 2008 until April 2011. She testified that the Fitzpatricks were always very cooperative, and she normally did not experience any problems with scheduling monthly home visits, although in April 2011 the scheduled home visit was cancelled twice due to the Fitzpatricks being busy with various issues. Ms. Maxwell testified that she never had any concerns about cleanliness or safety hazards in the home, but she acknowledged that her visits were always "announced," pre-scheduled visits, and during some of those visits, she only observed the first level of the home. Ms. Maxwell testified that when she had inspected the entire home, it appeared that the only room that was not accessible to the foster children was Megan's bedroom. She said the doors to the upstairs bathroom were never locked or obstructed. Ms. Maxwell testified that she was "shocked" when she saw the photographs of the conditions in the Fitzpatrick home because she had never seen it look "trashy like this." Ms. Maxwell responded "yes" when she was asked whether she believed that the Fitzpatricks were "in the foster parent business for the right reason" and whether they were honest and forthcoming with her. However, Ms. Maxwell said she was surprised and upset by the allegation that the Fitzpatricks had discovered SR fondling IR on two occasions, and each time, the Fitzpatricks left them and went back downstairs. She said that was "definitely not" behavior she would have expected from the Fitzpatricks.

The other five DCS employees who testified at the hearing had little to no personal involvement with the Fitzpatricks, and for the most part their testimony was repetitive. Thus, we will not belabor this opinion by describing their testimony here.

On May 16, 2012, the administrative law judge ("ALJ") entered a lengthy order describing her factual findings and conclusions of law in this matter. The order framed the issue as whether the Special Investigations Unit of DCS had properly determined that the Fitzpatricks were indicated perpetrators of child neglect, specifically, environmental neglect and lack of supervision. The order further stated that the administrative hearing was a de novo review of DCS's investigation, in order to determine if DCS's evidence met the required burden of proof, that is, a preponderance of the evidence. Regarding the issue of environmental neglect, the ALJ found several of the statements made by the Fitzpatricks to be "not believable" and "not credible," such as their claims that the upstairs bathroom was always locked, and that the home had only been in poor condition for a couple of days. She found it "clear that Mr. and Mrs. Fitzpatrick provided little, if any, adult supervision to the children on the third level of the home," specifically noting Detective Cooper's opinion that "it appeared the children had been turned loose and no adults were coming or going,

enforcing any rules or checking on the children." The ALJ described the conditions as an "ongoing situation of chaos and mess," and found that "the living condition did not meet the standard one expects when being paid to provide temporary care for these children." She concluded that DCS could not have continued to allow the children to remain in the home after witnessing the condition of the home on May 12. Nevertheless, the ALJ stated that a finding of environmental neglect would require a determination that the living situation was either dangerous or unhealthy. She found that the home was "certainly cluttered" but noted that there was no proof that the condition was dangerous or a health risk. For example, the ALJ noted that even trained pets sometimes have accidents, and there was no evidence that pet feces was a common occurrence or that it was not promptly removed when discovered. In sum, the ALJ concluded that "[w]hile the general upkeep of the home may fall below what most people's standards are, the evidence presented does not establish that the conditions in the home rose to the level of neglect." She accordingly found that the preponderance of the evidence did *not* establish that the Fitzpatricks should be indicated as perpetrators of child neglect based upon environmental neglect.

The ALJ also made lengthy findings regarding the allegation of lack of supervision.[14] The ALJ aptly noted that most of the facts regarding the evening of May 9 are not contested: Mr. Fitzpatrick saw SR touching IR's genitals in a sexual manner around 8:00 p.m. while the boys were on the bottom bed of a set of bunk beds; he told the boys to stop, told SR to get into his own bed, and then left the boys alone; Mr. Fitzpatrick immediately went to the first level of the home and told Mrs. Fitzpatrick what he had seen; the Fitzpatricks continued to watch television until bedtime; and the Fitzpatricks witnessed the same sexual behavior between SR and IR approximately two hours later. The ALJ stated, "The fact that is contested is what, if anything, [the Fitzpatricks] did after discovering the boys the second time." She noted Mrs. Fitzpatrick's testimony that after she and her husband discussed the situation in their bedroom on the second floor, she returned to the third floor and sat in a chair watching the boys for the remainder of the night in order to ensure that SR did not touch IR or anyone else. The ALJ noted Mrs. Fitzpatrick's admission that she did not mention staying up all night to Ms. King the following morning, or to Ms. Leckey and Detective Cooper during the interview on May 12. The ALJ summarized Mrs. Fitzpatrick's position as being that she did not tell anyone that fact because she was not asked. The ALJ found this explanation, "along with the statement that Mrs. Fitzpatrick sat in a chair all night on the evening of May 9, 2011, to lack credibility." The ALJ explained that Mrs. Fitzpatrick

---

[14] The ALJ's order discussed the April 2011 "face to crotch" incident but did not explicitly resolve the conflicting nature of the testimony regarding this incident. The ALJ found that SR was observed with his mouth over the area of IR's genitals, but she also noted Ms. King's testimony that she was not told by Mrs. Fitzpatrick that SR had his mouth over IR's genitals and that she was told that there was no touching during the incident.

"had every opportunity to relay the events of May 9, 2011, to multiple people," yet she did not mention staying up all night "until much later in the course of this case." The ALJ again referenced the early morning telephone call on May 10, and the interview on May 12, during which Ms. Fitzpatrick had "freely related what had occurred." Said the ALJ, "Sitting in a chair all night in a hallway outside a child's room to ensure no further sexual contact occurred is a major event that a person would include when asked about the evening."

The ALJ went on to find, however, that "[r]egardless of Mrs. Fitzpatrick's actions later in the evening of May 9, 2011, it is uncontroverted that neither Mr. Fitzpatrick nor Mrs. Fitzpatrick took any action after the first incident around 8 p.m. to protect or supervise the children." The ALJ noted that the placement contracts signed by the Fitzpatricks included two office telephone numbers and also an after hours telephone number for the DCS staff assigned to the children's case, yet the Fitzpatricks failed to contact anyone at DCS. The ALJ also noted that the Fitzpatricks did not separate the boys. In sum, the ALJ found,

> . . . [The Fitzpatricks] did nothing to ensure SR did not have the opportunity to sexually perpetrate on any other minor in the home. [The Fitzpatricks] are trained and licensed foster parents. Mrs. Fitzpatrick was a licensed provider of child care. [The Fitzpatricks] witnessed a seven-year-old boy sexually perpetrating on his three-year-old brother. Even without this special training, a reasonable person would not have told the boys to get in their own beds, turned off the light, and then walked away. The actions and inactions of Mr. and Mrs. Fitzpatrick put all of the children at risk of harm. In fact, the situation created by [the Fitzpatricks] is a direct cause to what did occur – SR sexually perpetrating on another child. While the incidents were between SR and IR, [the Fitzpatricks'] failure to act in a reasonable manner placed all the children at risk of harm. SR was a young child who needed appropriate boundaries so that he did not have the opportunity to become a perpetrator. [The other children in the home] needed [the Fitzpatricks] to establish appropriate boundaries to protect them from SR. [The Fitzpatricks'] actions showed such a lack of supervision as to be negligent.
> . . . [The Fitzpatricks] admitted to leaving SR unsupervised after having found him sexually touching one of his siblings. . . . [The Fitzpatricks] were home and knew inappropriate sexual contact had been made between two minors yet did not take any action to protect any of the children. [The Fitzpatricks] were being paid by the State to care for five of the six minor children in the home. By leaving SR alone with his much younger sibling, [the Fitzpatricks] placed SR in a situation that was beyond his maturity level. [The Fitzpatricks] failed to properly supervise all six minor children in their home to ensure they were neither the victim nor the perpetrator of sexual assault.

Therefore, this Administrative Judge concludes that the evidence presented at the Hearing meets the required burden of a preponderance of the evidence and supports the findings that [the Fitzpatricks] are the indicated perpetrators in a validated case of neglect regarding SR and IR.[15]

As for the Fitzpatricks' request for an award of attorney's fees pursuant to Tennessee Code Annotated section 4-5-325, the ALJ concluded that such an award was not appropriate because DCS had "correctly indicated [the Fitzpatricks] as perpetrators of child neglect." The request for attorney's fees was accordingly denied.

The order of the ALJ became a final order within due time. The Fitzpatricks then filed a petition for review in chancery court pursuant to Tennessee Code Annotated section 4-5-322. Before the chancery court, the Fitzpatricks argued that the ALJ's decision was arbitrary and capricious and unsupported by substantial and material evidence, and they claimed that the decision violated their rights to procedural and substantive due process. Finally, they argued that they should have been awarded their attorney's fees pursuant to Tennessee Code Annotated section 4-5-325. Following a hearing, the chancery court entered an order on March 8, 2013, in which it found that the ALJ's decision was not arbitrary or

---

[15] The rules and regulations promulgated by DCS state that

Proof of one or more of the following factors, linking the abusive act(s) to the alleged perpetrator, may constitute a preponderance of the evidence:

(a) Medical and/or psychological information from a licensed physician, medical center, or other treatment professional, that substantiates that physical abuse, sexual abuse, or severe physical abuse occurred;
(b) An admission by the perpetrator;
(c) The statement of a credible witness or witnesses to the abusive or neglectful act;
(d) The child victim's statement that the abuse occurred;
(e) Physiological indicators or signs of abuse or neglect, including, but not limited to, cuts, bruises, burns, broken bones or medically diagnosed physical conditions;
(f) Physical evidence that could impact the classification decision:
(g) The existence of behavioral patterns that may be indicative of child abuse/neglect and corroborates other evidence of abuse, severe child abuse, child sexual abuse, or neglect;
(h) The existence of circumstantial evidence linking the alleged perpetrator to the abusive or neglectful act(s) (e.g., child was in care of the alleged perpetrator at the time the abuse occurred and no other reasonable explanation of the cause of the abuse exists in the record).

Tenn. Comp. R. & Regs. 0250-07-09-.06. Here, the ALJ found that factors (b), (d), and (e) were met because the Fitzpatricks admitted to leaving the boys unsupervised, IR stated during his forensic interview that SR had touched him two times, and the children were in the Fitzpatricks' care and custody on the evening of May 9.

capricious or unsupported by substantial and material evidence, and it did not violate constitutional provisions. The chancery court denied the Fitzpatricks' request for attorney's fees. The Fitzpatricks timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

The Fitzpatricks present the following issues, as we perceive them, for review on appeal:

1. Was the ALJ's decision to uphold the indication for child neglect based upon lack of supervision unsupported by substantial and material evidence?
2. Did the ALJ's decision to indicate the Fitzpatricks because they left the boys unattended between 8:00 and 10:00 p.m. violate the Fitzpatricks' right to procedural due process in the sense that they were not given notice reasonably calculated to apprise them of the charge against them?
3. Was the decision to indicate the Fitzpatricks arbitrary and conscience-shocking, and therefore, in violation of their right to substantive due process?
4. Were the Fitzpatricks entitled to an award of attorney's fees pursuant to Tennessee Code Annotated section 4-5-325?

For the following reasons, we affirm the decision of the chancery court in part, and we reverse in part and remand for further proceedings.

## III. STANDARD OF REVIEW

Courts defer to the decisions of administrative agencies when they are acting within their area of specialized knowledge, experience, and expertise; accordingly, judicial review of an agency's action follows the narrow, statutorily defined standard of review contained in the Uniform Administrative Procedures Act, Tenn. Code Ann. § 4-5-322(h), rather than the broad standard of review used in other civil appeals. *Wayne County v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988). Section 4-5-322 provides for judicial review of the ALJ's decision as follows:

> (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h).

## IV. DISCUSSION

### A. *Substantial & Material Evidence*

The Fitzpatricks' first argument on appeal is that the ALJ's decision to indicate them as perpetrators of child neglect based upon lack of supervision was unsupported by substantial and material evidence.

In considering whether substantial and material evidence supports an agency's decision, we must determine whether the administrative agency's decision is supported by "'such relevant evidence as a rational mind might accept to support a rational conclusion.'" *Milligan v. Bd. of Professional Responsibility*, 301 S.W.3d 619, 629 (Tenn. 2009) (quoting *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 110-11 (Tenn. Ct. App. 1993)). "The substantial and material evidence standard has also been described as requiring something less than a preponderance of the evidence but more than a scintilla or glimmer." *Beard v. Bd. of Professional Responsibility*, 288 S.W.3d 838, 855 (Tenn. 2009) (internal quotation omitted). "The narrower scope of review used to review an agency's factual determinations suggests that, unlike other civil appeals, the courts should be less confident that their judgment is preferable to that of the agency." *Wayne County*, 756 S.W.2d at 279 (citing 2 C. Koch, *Administrative Law & Practice* § 9.4 (1985)). "'The evidence will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed.'" *Milligan*, 301 S.W.3d at 629 (quoting *Jackson*, 876 S.W.2d at 110-11).

As noted above, Tennessee Code Annotated section 37-1-406 requires DCS to investigate reports of child abuse and child sexual abuse and to determine, within sixty days, "whether the reported abuse was indicated or unfounded and report its findings to the department's abuse registry." Tenn. Code Ann. § 37-1-406(a), (i). "A report made against an alleged perpetrator shall be classified as 'indicated' if the preponderance of the evidence,

-23-

in light of the entire record, proves that the individual committed abuse, severe child abuse, child sexual abuse, or neglect." Tenn. Comp. R. & Regs. 0250-07-09-.06(1). Accordingly, the term "indicated" is defined as "the classification assigned to an individual found to be a perpetrator of abuse, severe child abuse, child sexual abuse, or neglect as the result of investigation of a report of abuse." Tenn. Comp. R. & Regs. 0250-07-09-.01(9).

The rules and regulations promulgated by the Department of Children's Services define "abuse" as it is defined by Tennessee Code Annotated section 37-1-102(b)(1), which states that abuse exists "when a person under the age of eighteen (18) is suffering from, has sustained, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker." Tenn. Comp. R. & Regs. 0250-07-09-.01(1). The Regulations define "neglect" in accordance with the statutory definition of "dependent and neglected child" provided by Tennessee Code Annotated section 37-1-102(b)(12), which means, relevant to this appeal, a child "[w]ho is under unlawful or improper care, supervision, custody or restraint," or "is under such improper guardianship or control as to injure or endanger the morals or health of such child or others," or "is suffering from abuse or neglect." Tenn. Comp. R. & Regs. 0250-07-09-.01(6)(C), (F) and (G). Although the precise term "neglect" is not defined by the statute, this Court has stated that it "has an ordinary and commonly understood meaning." *State, Dep't of Children's Services v. M.S.* No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *9 (Tenn. Ct. App. Mar. 8, 2005) *perm. app. denied* (Tenn. Aug. 29, 2005).

In the case before us, the ALJ found that the Fitzpatricks did not adequately supervise the children after they "witnessed a seven-year-old boy sexually perpetrating on his three-year-old brother." The ALJ also found that SR was "sexually touching" IR. The Fitzpatricks argue on appeal that there is no substantial and material evidence to support the ALJ's conclusion that SR was "fondling" IR. They concede that SR had his hands "down IR's pants," and they also acknowledge that IR stated during his forensic interview at the child advocacy center that SR had "touched" his "wee wee" on two occasions. Still, the Fitzpatricks argue on appeal that "DCS assumed that SR was fondling IR's genitals, but did nothing to investigate this and consequently produced no evidence to support the assumption at the hearing."

Despite the Fitzpatricks' argument, we find substantial and material evidence to support the ALJ's conclusion that SR was in fact "fondling" IR. The Fitzpatricks did not present any evidence or otherwise suggest throughout the administrative proceeding that SR was doing something other than fondling IR's genitals. In fact, in a different section of the Fitzpatricks' brief on appeal, they say it was "never disputed" that SR "touched IR's penis." Mrs. Fitzpatrick testified herself that after she ran upstairs in response to the second incident,

she observed the boys facing each other with their legs spread, and SR was removing his hands from IR's pants. Ms. King's case recording notes from the next day, May 10, 2011, recounted details from the early morning telephone call from Mrs. Fitzpatrick and stated that during the first incident, SR was found with his hands down IR's pants "playing with his penis," and the second time, he was "again using his hand to rub IR's penis." IR confirmed during his forensic interview that SR had reached into his underwear, touched his "wee wee," and "pulled it out." Thus, substantial and material evidence supports the ALJ's finding that SR was fondling IR.

Next, the Fitzpatricks argue that there is "not a scintilla of evidence in the record" to support the ALJ's conclusion that their response to the 8:00 incident was inappropriate. The Fitzpatricks argue that "[a] reasonable person relying upon the information in [the booklet provided by DCS] would conclude that SR's behavior was normal sexual play." The booklet stated that childhood sexual play, "like 'playing doctor,'" is unplanned, intermittent, agreed to by both children, merely curious in nature, and occurs between children "of a similar age, size, and developmental level." In the example of normal sexual play that Mrs. Fitzpatrick claimed to have relied upon, the brothers who were touching each other were ages seven and nine. Mrs. Fitzpatrick acknowledged during her testimony that the second example listed in the booklet described an incident between neighbors, ages 10 and 6, which the booklet described as "of more concern due to the four-year age difference" between the children, and she conceded that there was a four-year age difference between SR and IR, ages 7 and 3. The booklet also stated that "intrusive" sexual acts are *not* part of typical or normal sex play and are, instead, problem behaviors. The booklet pointed out that in the first example involving the brothers, "[n]either child was pressured to do the behavior." Thus, we find it questionable that one would read the booklet provided by DCS and conclude that SR was engaged in normal childhood sexual play, "like 'playing doctor.'" More importantly, however, Mrs. Fitzpatrick testified that when her husband came downstairs and told her what he had observed during the first incident, she immediately responded, "That's not O.K." According to Mrs. Fitzpatrick, she and Mr. Fitzpatrick sat there "dumbfounded" for a moment, then she mentioned that Ms. King had given her a booklet suggesting that some sexual exploration is normal. Mrs. Fitzpatrick testified that her husband then said, "You think?" and she responded, "Well, no, not really, but I don't know what to do." Clearly, the Fitzpatricks realized that there was a problem with the situation they had just discovered, and they did not consider SR's behavior "normal."

The Fitzpatricks cite other passages from the booklet and claim that Mrs. Fitzpatrick relied upon the advice in these passages regarding how to respond to normal sexual play. However, we find that the cited passages do not support the Fitzpatricks' position that they

responded appropriately.[16] The booklet stated, "Rather than ignoring these behaviors, the best response a caregiver can have is to use the discovery of sex play as 'a teachable moment.'" It stated, "Children will often respond well to accurate information, to the opportunity to have their questions answered, to *good supervision*, and to reminders of social rules." (Emphasis added). By the Fitzpatricks' own admission, Mr. Fitzpatrick went upstairs to investigate the noise he heard at 8:00 and returned within five minutes. During that time, he "got onto" the boys and told them to stop what they were doing, he instructed them to get into their own beds, and then he went back downstairs. According to Mrs. Fitzpatrick's testimony, the foster children generally did not go to sleep until sometime between 9:00 and 10:00 p.m. Still, knowing what had just occurred, neither Mr. Fitzpatrick nor Mrs. Fitzpatrick went upstairs to check on the boys after the 8:00 incident, until they heard another noise between 10:00 to 10:30 p.m. Instead, they watched television for two hours on the first level of the home. Regardless of the Fitzpatricks' claims about why they did not attempt to call DCS or separate the boys that evening, they basically offered no excuse for why they did not monitor or even check on the boys between 8:00 and 10:00 p.m., aside from Mrs. Fitzpatrick's testimony that she never expected the boys to repeat the same behavior.

Again, the ALJ concluded that "a reasonable person would not have told the boys to get in their own beds, turned off the light, and then walked away," knowing that sexual contact had just occurred. We find that this conclusion is supported by substantial and material evidence; that is, the evidence presented "furnishes a reasonably sound factual basis for the decision being reviewed." *Milligan*, 301 S.W.3d at 629. We also find that the preponderance of the evidence supports the ALJ's ultimate conclusion that the Fitzpatricks did not properly supervise the children, considering all of the circumstances, after they found SR fondling IR's genitals at 8:00 p.m.

We note that the Fitzpatricks also argue on appeal that "DCS presented no proof that SR's touching was sexually motivated or sexually gratifying to either SR or IR." However, we think that this argument misses the point. SR was fondling the genitals of his much younger brother, for whatever reason. SR's motivation for engaging in this act does not excuse the Fitzpatricks from responding appropriately. We can discern no basis for requiring DCS to prove that SR's touching was "sexually motivated or sexually gratifying."

---

[16] We have not discussed some of the passages cited in the Fitzpatricks' brief on appeal because we find their claimed reliance upon them disingenuous considering Mrs. Fitzpatrick's testimony at trial that she only read the first eleven to twelve pages of the 72-page booklet because she was too busy.

### B.    Procedural Due Process

Next, the Fitzpatricks argue that the ALJ's decision to indicate them for lack of supervision based upon their actions between 8:00 and 10:00 p.m. violated their right to procedural due process because, they claim, they had no notice that their indication was based upon their conduct during that timeframe.

Procedural due process requires a government entity to employ fundamentally fair procedures whenever it acts to deprive a person of a right to or interest in life, liberty, or property.  *Miller v. Tenn. Bd. of Nursing*, 256 S.W.3d 225, 234 (Tenn. Ct. App. 2007) (citing *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994 (1972); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 309 (Tenn. 2005)).  "Basic due process requires 'notice reasonably calculated under all the circumstances, to apprise interested parties' of the claims of the opposing parties."  *McClellan v. Bd. of Regents of State Univ.*, 921 S.W.2d 684, 688 (Tenn. 1996) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)).  The purpose of the due process requirement of notice "is to notify the individual in advance in order to allow adequate preparation and reduce surprise."  *Id.* (citing *Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1, 14, 98 S.Ct. 1554, 1562–63, 56 L.Ed.2d 30 (1978)).

The protections of procedural due process also apply to administrative proceedings.  *Martin v. Sizemore*, 78 S.W.3d 249, 263 (Tenn. Ct. App. 2001) (citing *Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 455 (Tenn. 1995); *Medley v. Maryville City Beer Bd.*, 726 S.W.2d 891, 895 (Tenn. 1987) (Fones, J., dissenting)).  In administrative proceedings, "'the minimum requirements of due process must be satisfied when an agency's decision could adversely affect vested property interests or other constitutional rights.'"  *ARI, Inc. v. Neeley*, No. M2011-02272-COA-R3-CV, 2012 WL 3157120, at *5 (Tenn. Ct. App. Aug. 3, 2012) (quoting *Martin*, 78 S.W.3d at 267).  Part 3 of the Uniform Administrative Procedures Act "sets forth the various procedures for hearing and determining contested cases at the agency level and on appeal."  *McClellan*, 921 S.W.2d at 688.  The Act specifically addresses the minimum notice required in contested administrative cases, such as the one before us.  *Liberty Mut. Ins. Co. v. Tenn. Dep't of Labor & Workforce Dev.*, No. M2010-02082-COA-R3-CV, 2012 WL 11739, at *5 (Tenn. Ct. App. Jan. 3, 2012).  It provides that in any contested case, the parties are first entitled to reasonable notice, which must include a statement of the nature of the hearing, a statement of the legal authority and jurisdiction under which the hearing is to be held, and a "short and plain statement of the matters asserted."  *McClellan*, 921 S.W.2d at 688 (citing Tenn. Code Ann. § 4-5-307(b)(1)(2) & (3)).  If the agency is "unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved."  **Tenn. Code Ann. § 4-5-307(b)(3).**  However, "upon timely, written application a more

definite and detailed statement shall be furnished ten (10) days prior to the time set for the hearing." ***Id.***

In the case before us, it is undisputed that Ms. Leckey telephoned Mrs. Fitzpatrick approximately a week after the children were removed from the home, on May 18, 2011, and informed her that she and Mr. Fitzpatrick were going to be indicated for lack of supervision and environmental neglect. Ms. Leckey also told Mrs. Fitzpatrick that she would be receiving paperwork regarding the decision and encouraged her to file an appeal. On June 1, 2011, DCS Team Leader Rhonda Gooding hand delivered a notice to Mrs. Fitzpatrick, informing her that the foster children were removed from her home because of the environmental issues that were observed and also because there were "two episodes of sexually reactive behavior occurring between two siblings in the home that were not immediately addressed" by the resource parents. The Fitzpatricks filed a notice of appeal of the decision to remove the children from the home, stating, among other things, "The episodes of alleged sexually reactive behavior were immediately and properly addressed by the resource parents." We note, however, that these documents specifically pertained to the reasons for DCS's decision to remove the foster children from the home, not the reasons for the decision to indicate the Fitzpatricks. Mrs. Fitzpatrick acknowledged that she heard Ms. Leckey testify, at the hearing regarding the children's removal from the home on June 21, 2011, that her issue of concern was that the boys had been left alone twice on the evening of May 9 – the first time for a couple of hours and then again for the rest of the night – after SR was found sexually touching IR. Mrs. Fitzpatrick was then asked, "So on June 21ˢᵗ, 2011 you absolutely knew in great detail what the issue was that the Department of Children's Services had with your reaction on May 9ᵗʰ in protecting the boys?" She responded, "Yes. We found out that day, yes."

On appeal, DCS points out that the original "perpetrator letters" and attachments mailed by Ms. Leckey to the Fitzpatricks on July 25, 2011, are not included in the record before us. Thus, it is impossible for us to know what information or "notice" was provided in these letters. On January 11, 2012, the ALJ sent a letter to the Fitzpatricks informing them of the time, place, and nature of the scheduled hearing and stating that "[t]he issue to be discussed at the hearing is the determination by the [DCS] office that Mr. and Mrs. Fitzpatrick are the indicated perpetrators in a validated case of child abuse/child neglect involving [the children]." Prior to the hearing, the Fitzpatricks filed a motion for more definitive statement, citing Tennessee Code Annotated section 4-5-307(b)(3), asking DCS to provide "a more definite and detailed statement of [its] decision to indicate [the Fitzpatricks] as perpetrators of child abuse," to "specify the abuse that [DCS] validated, and describe specifically and in detail the facts upon which [DCS] relies to support the validation." In response, DCS filed an answer to the motion stating that the Fitzpatricks were indicated "for Lack of Supervision based upon their actions of leaving SR (DOB 9-5-03)

-28-

unsupervised overnight in the room with IR (DOB 5-29-07), despite Jeff Fitzpatrick having caught SR on two occasions on the evening of May 9, 2011 fondling IR's genitals and Melissa Fitzpatrick being aware of these facts." The Fitzpatricks also asked DCS, during discovery, to list and specifically describe all abuse and neglect that had allegedly occurred. DCS objected to the request as overly broad and burdensome, and referred the Fitzpatricks to the DCS case file containing detailed information about the case. Without waiving that objection, however, DCS went on to state that the neglect fell into two categories: "The first and most important [category of neglect] is the failure to properly supervise the children and failure to protect the children from further sexual harm. SR [] was left overnight in the room with IR [] despite Jeff Fitzpatrick having caught SR on two occasions on the evening of May 9, 2011 fondling IR's genitals."

On appeal, the Fitzpatricks claim that they interpreted DCS's response to their motion for more definitive statement, and its discovery response, to mean that they were being indicated for lack of supervision based solely upon their response to the *second* time they discovered SR fondling IR. In other words, they claim that they were led to believe that only their conduct after the 10:00 p.m. incident was relevant to their indication. As support for their argument, they point to DCS's use of the word "overnight" and claim that this would refer only to the timeframe between 10:00 p.m. and the next morning. They also point out that DCS's responses stated that the boys were found on two occasions that evening with SR fondling IR's genitals.

Considering all of the circumstances of this case, we are not persuaded that DCS's responses can reasonably be read as limiting the relevant timeframe to only what occurred after 10:00 p.m. The statement that the Fitzpatricks were indicated for leaving SR "unsupervised overnight in the room with IR [], despite Jeff Fitzpatrick having caught SR on two occasions on the evening of May 9, 2011 fondling IR's genitals," can reasonably be read as referring to the entire period during which the two incidents took place – from the time the children were sent upstairs for quiet time before bed until the next morning. The use of the term "overnight" would not necessarily exclude what happened between 8:00 and 10:00 p.m. In addition, the response simply noted that the boys were left unsupervised that evening despite the fact that SR was found fondling IR's genitals on two occasions. We cannot say that a reasonable person in the Fitzpatricks' position would read this response and conclude that they were only being indicated based upon what occurred after 10:00 p.m. We find that the Fitzpatricks were provided with adequate notice of the facts that would be presented against them, and the notice was "reasonably calculated under all the circumstances, to apprise [the Fitzpatricks] of the claims of the opposing parties." *McClellan*, 921 S.W.2d at 688.

We also recognize that the purpose of the due process requirement of notice "is to notify the individual in advance in order to allow adequate preparation and reduce surprise." *Id.* The Fitzpatricks argue on appeal that they "were not on notice before or even during the administrative hearing that they needed to defend their actions of leaving SR and IR alone between 8 p.m. and 10 p.m. on May 9, 2011, . . . upon discovering the *first* incident." However, the Fitzpatricks do not explain how they were actually prejudiced in this regard. In other words, they do not claim that, if they had only known that their response to the 8:00 p.m. incident was under scrutiny, they would have proceeded differently or testified in a different manner. We also find it doubtful that the Fitzpatricks did not realize that they needed to defend their actions in response to the 8:00 incident. On the first day of the contested case hearing, the attorney for DCS stated in her opening statement:

> . . . This is the basis for indication for lack of supervision. And it was indicated as lack of supervision because SR is only 7, so it was not indicated as sexual abuse, but rather as sexually reactive child. Regardless though, after twice finding SR fondling IR's genitals, doing something that then is likely to cause problems with IR becoming a sexually reactive child as well, *they left them in the room, alone, unsupervised, for two hours after finding the first incident at 8:00 when they certainly could have called the on-call worker, the hot line, called in a referral, called the police, whatever they needed to do, separated the children. Something could have been done to protect the child IR from being perpetrated on.* And I hate to use that word because we have a 7 year old. And also SR from enforcing and reinforcing this pattern of sexually acting out with his 3 year old brother. That was not done.

(Emphasis added). Counsel for the Fitzpatricks did not object to this argument regarding the Fitzpatricks' response to the 8:00 incident. During the hearing thereafter, there was extensive questioning and testimony regarding every detail of the evening of May 9, 2011, including what happened between 8:00 and 10:00 p.m. Mrs. Fitzpatrick testified at length about the Fitzpatricks' responses to both incidents, explaining why she did not attempt to call DCS that evening, why she did not separate the boys into different rooms, and why she never expected that SR would fondle IR again that very night. When Ms. Leckey was testifying about why she made the decision to indicate the Fitzpatricks for lack of supervision, she specifically referred to the fact that the boys had been left alone "twice" after they were discovered engaging in sexual behavior. She testified that after the first incident, Mr. Fitzpatrick basically walked out and left the boys alone. Ms. Leckey acknowledged her previous testimony during the removal hearing, when she stated that she had concluded that the Fitzpatricks had not properly supervised the boys on May 9 because "the [Fitzpatricks] had left the children two times within two hours all night unsupervised. Basically went in, told them to lay down, and walked back out[.]" Ms. Leckey reiterated that the Fitzpatricks

-30-

had basically found the boys engaged in sexual behavior "two different times," told them to get back in their beds, and left the room. Counsel for the Fitzpatricks did not object to any of this testimony. In fact, the Fitzpatricks' attorney questioned Ms. Leckey extensively about the form Ms. Leckey completed at the conclusion of her investigation, on which she stated that the foster children were removed from the home "due to lack of supervision by the foster parents" when they found SR sexually touching IR "two different times within a few hours and did nothing until the following morning except for tell the boys to get back in their own beds[.]" And again, when the administrative law judge asked Ms. Leckey a question specifically concerning the basis of her decision to indicate the Fitzpatricks, Ms. Leckey responded, "It was basically the incident that occurred that night two times that they knew and from all information did not do anything other than tell the boys to get back in their beds and waited until the next morning to call."

Because the Fitzpatricks have not demonstrated that their claimed misperception about the basis for their indication actually affected their ability to prepare their defense or affected the merits of their case, we will not reverse the ALJ's decision based upon this issue. *See* Tenn. Code Ann. § 4-5-322(i) ("No agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision."); *see also **Nevin v. Bd. of Professional Responsibility of Supreme Court***, 271 S.W.3d 648, 656 (Tenn. 2008) (declining to reverse sanctions against an attorney on due process grounds where a disciplinary rule he was found to have violated was not explicitly alleged in the petition against him, as the issue was tried by consent and the attorney failed to show that his defense was prejudiced in any way); ***Cox v. Tenn. Bd. of Veterinary Medical Examiners***, No. M2010-01582-COA-R3-CV, 2011 WL 5043380, at *10-11 (Tenn. Ct. App. W.S. Oct. 21, 2011) (declining to reverse sanctions against a veterinarian where he claimed that the notice of charges against him was deficient and denied him due process but failed to show that the alleged error affected his ability to prepare a defense); ***Byrd v. Tenn. Bd. of Chiropractic Examiners***, No. M2010–01473–COA–R3–CV, 2011 WL 3558166, at *9-10 (Tenn. Ct. App. W.S. Aug. 11, 2011) (declining to reverse sanctions against a chiropractor who claimed a violation of his due process right to notice but failed to demonstrate that he was prejudiced by the alleged lack of specificity in the notice of charges).

For all of these reasons, we conclude that the Fitzpatricks were not denied procedural due process, and they are not entitled to relief based upon this issue.

### C.     Substantive Due Process

The next issue raised by the Fitzpatricks is whether their indication for neglect violated their right to substantive due process. The Fitzpatricks had served as foster parents for many years, and Mrs. Fitzpatrick was employed as the director of a daycare. They claim that because they have been indicated as perpetrators of child abuse or neglect, they can no longer serve as foster parents, and Mrs. Fitzpatrick cannot continue her current employment.[17] *See* Tenn. Code Ann. § 71-3-507; Tenn. Comp. R. & Regs. 1240-04-03-.07. The Fitzpatricks note their history of providing care to many other foster children, and the testimony from various witnesses who opined that the Fitzpatricks do not pose a threat to children, in support of their argument that the decision to indicate them goes "far beyond the limits of legitimate governmental action" and is "arbitrary and conscience-shocking."

The substantive component of the Due Process Clause "bars certain governmental actions regardless of the procedures used to implement them." *Parks Properties v. Maury County*, 70 S.W.3d 735, 744 (Tenn. Ct. App. 2001) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 1713, 140 L.Ed.2d 1043 (1998); *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)). In other words, the proponent of a substantive due process claim does not merely contend that there was a flaw in the process by which he or she lost a fundamental right; rather, he or she claims to have suffered a loss that is so far beyond the outer limits of legitimate governmental action that no amount of process could cure the deficiency. *Vaught v. Jakes*, No. M2007-01858-COA-R3-CV, 2009 WL 2357108, at *11 (Tenn. Ct. App. July 29, 2009) (citing *Parks Properties*, 70 S.W.3d at 744).

The substantive due process analysis applies to two entirely different sorts of governmental action: legislative acts, generally including statutes, ordinances, and broad administrative regulations; and non-legislative or executive acts, which typically apply to one person or a limited number of persons. *Parks Properties*, 70 S.W.3d at 744 (citing *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139 n.1 (3d Cir. 2000)). Although the guarantees of substantive due process limit what the government may do in both its legislative and its executive capacities, the "criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *County*

---

[17] We recognize that "[t]he right to engage in a chosen business, occupation, or profession without unreasonable governmental interference or deprivation thereof is both a liberty and property interest, protected by the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Article I Section 8 of the Tennessee Constitution." *State v. AAA Aaron's Action Agency Bail Bonds, Inc.*, 993 S.W.2d 81, 85 (Tenn. Crim. App. 1998) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985)).

*of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see also Vaught*, 2009 WL 2357108, at *11 ("For purposes of substantive due process analysis, our courts have drawn a distinction between legislative and non-legislative acts[.]"); *Consol. Waste Systems, LLC v. Metro. Gov't of Nashville & Davidson County*, No. M2002-02582-COA-R3-CV, 2005 WL 1541860, at *5 n.3 (Tenn. Ct. App. June 30, 2005) ("the standard for determining whether action taken in a legislative capacity violates [substantive due process] guarantees is different from that applicable to executive conduct"). Here, the Fitzpatricks challenge DCS's decision to indicate them as perpetrators of neglect, which constitutes a non-legislative or executive act.[18]

"[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *County of Sacramento*, 523 U.S. at 847 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992)). Thus, "a non-legislative or executive act will withstand a substantive due process challenge unless it is (1) arbitrary, irrational, or tainted by improper motive, or (2) so egregious that its shocks the conscience." *Parks Properties*, 70 S.W.3d at 744 (citations omitted); *see also Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 309 (Tenn. 2005) (explaining that substantive due process is implicated when an executive agency of government acts in a manner that is either arbitrary, irrational or improperly motivated, or so egregious that it shocks the conscience). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]'" *County of Sacramento*, 523 U.S. at 846 (quoting *Collins*, 503 U.S. at 129). The type of official conduct that is "most likely to rise to the conscience-shocking level" is "conduct intended to injure in some way unjustifiable by any government interest." *Chavez v. Martinez*, 538 U.S. 760, 775 (2003) (citing *County of Sacramento*, 523 U.S. at 849).

Despite the Fitzpatricks' vague assertion in their brief that DCS's decision to indicate them "is intended to, and does in fact injure them greatly," we find no evidence in the record to suggest that DCS "acted with a purpose to harm" the Fitzpatricks. *See id.* Moreover, we find nothing arbitrary, irrational, improper or egregious in DCS's decision to indicate the Fitzpatricks' for neglect based upon their lack of supervision of the children on the evening of May 9, 2011. A three-year-old foster child was sexually touched by another child on two occasions that evening, while under the supervision of the Fitzpatricks. Following an investigation, DCS concluded that the Fitzpatricks did not properly supervise the children, and after a full hearing, that decision was upheld by an ALJ. We have already determined that there is adequate evidence in the record to support the ALJ's decision. The executive action under review does not "shock the conscience" or otherwise lead us to conclude that

---

[18] We note that the Fitzpatricks do not present any argument regarding the constitutionality of the statutes or regulations applicable to indicated perpetrators of abuse or neglect.

the Fitzpatricks' right to substantive due process has been violated.

### D.    Attorney's Fees

Finally, the Fitzpatricks contend that they are entitled to an award of attorney's fees pursuant to Tennessee Code Annotated section 4-5-325(a), which provides, in relevant part:

(a) When a state agency issues a citation to a person, local governmental entity, board or commission for the violation of a rule, regulation or statute and such citation results in a contested case hearing, at the conclusion of such hearing, the hearing officer or administrative law judge may order such agency to pay to the party issued a citation the amount of reasonable expenses incurred because of such citation, including a reasonable attorney's fee, if such officer or judge finds that the citation was issued:

(1) Even though, to the best of such agency's knowledge, information and belief formed after reasonable inquiry, the violation[19] was not well grounded in fact and was not warranted by existing law, rule or regulation; or

(2) For an improper purpose such as to harass, to cause unnecessary delay or cause needless expense to the party cited.

The Fitzpatricks argue that their indication for environmental neglect "was clearly not well-grounded in fact," under subsection (a)(1), because "the evidence did not establish that the children had been exposed to any dangerous conditions."  The Fitzpatricks interpret the aforementioned statute as providing for an award of attorney's fees for a citation not well-grounded in fact or law "even though [it is made] to the best of such agency's knowledge, information and belief formed after reasonable inquiry."  In other words, the Fitzpatricks claim that the statute provides for a fee award to individuals who have been "wrongly accused and forced to incur legal expenses as a result."

In response, DCS notes that the full language of the statute, provided in context, states that an award of attorney's fees may be made if a judge finds "that the *citation* was issued . . . [e]ven though, to the best of such agency's knowledge, information and belief formed after reasonable inquiry, the violation was not well grounded in fact and was not warranted

---

[19]    When considering this statutory text on a previous occasion, we stated, "We assume the legislature intended to use the word 'citation' in this subsection instead of the word 'violation,'" because "only by making the substitution does the subsection make sense." *American Child Care, Inc. v. State*, 83 S.W.3d 148, 151 (Tenn. Ct. App. 2001).

by existing law, rule or regulation[.]" Tenn. Code Ann. § 4-5-325(a) (emphasis added). DCS claims that the conditions of the Fitzpatrick home were "deplorable" and that there is nothing in the record to suggest that DCS's actions were unsupported by fact or otherwise intended to harass the Fitzpatricks. The chancery court affirmed the ALJ's decision to deny the Fitzpatricks' claim for attorney's fees, finding no evidence that DCS issued the citation when to the best of the agency's knowledge, information, and belief the violation was not well grounded in fact and not warranted by law.

Based upon our research, Tennessee Code Annotated section 4-5-325 has only been interpreted and discussed in two Tennessee appellate opinions since it became effective in 1994. In *American Child Care, Inc. v. State*, 83 S.W.3d 148, 151 (Tenn. Ct. App. 2001), the Middle Section of this Court was asked to review a trial court's denial of a request for attorney's fees pursuant to section 4-5-325, after a child care center's license had been summarily suspended and later reinstated, due to an incident where a child ran out of the daycare and into the street. The trial court had concluded that section 4-5-325 reflected that the legislature had struck a balance "between providing agencies the necessary leeway to perform their regulatory duty to protect the community but checking any abuse by the agency of its power[.]" Thus, the trial court interpreted the statute as only allowing the recovery of attorney's fees "where [] there is abuse in the nature of intentional conduct, such as harassment or bad faith by an agency[.]" *Id.* at 152. On appeal, the Middle Section recognized that "the grammatical construction of the statute [] leaves much to be desired." *Id.* at 151 n.1. However, the Court ultimately disagreed with the trial court's interpretation:

> We think the trial court read Tenn. Code Ann. § 4–5–325(a) too narrowly in finding that "abuse in the nature of intentional conduct, such as harassment or bad faith by an agency" is required for a party to recover attorney's fees. The statute states alternative grounds for awarding attorneys' fees where the citation issued (1) for a reason not well grounded in fact and not warranted in existing law, rule or regulation; or (2) for an improper purpose such as to harass, to cause unnecessary delay or cause needless expense. Therefore a proceeding brought with the utmost good faith may result in an award of attorneys' fees to the cited party if the citation was not well grounded in fact and not warranted by existing law.

*Id.* at 152.

The Middle Section decided another case involving section 4-5-325 in *Tennessee Department of Health v. Chary*, No. M2012–00866–COA–R3–CV, 2013 WL 1576251 (Tenn. Ct. App. Apr. 12, 2013). Following a contested case hearing in which all material facts were stipulated, the Board of Medical Examiners dismissed all charges against four

doctors upon finding that the Department of Health had not proven facts sufficient to establish violations of the cited statutes and regulations. *Id.* at *1. The doctors were awarded attorney's fees as well. The chancery court upheld the award of attorney's fees, finding that the charges were not well grounded in fact and were "brought without sound judgment." *Id.* at *2. On appeal, the Middle Section noted its previous holding, in *American Child Care*, that section 4-5-325 does not require a showing of intentional conduct or bad faith in order for attorney's fees to be awarded. *Id.* at *4. "In fact," the Court noted, "'a proceeding brought with the utmost good faith may result in an award of attorney's fees to the cited party if the citation was not well grounded in fact and not warranted by existing law.'" *Id.* (quoting *American Child Care*, 83 S.W.3d at 152). The Middle Section found that the charges against the doctors were not well-grounded in fact or warranted by law, and it noted that information had come to the attention of the Department of Health during the proceedings which put the Department on notice that the charges were not well-grounded in fact or warranted in law, yet the Department did not voluntarily dismiss the charges. *Id.* at *5. As a result, the Court found "that there is substantial and material evidence to support the administrative law judge's determination that the [doctors] [were] entitled to attorneys' fees and costs under Tennessee Code Annotated § 4-5-[3]25." *Id.*

We share in the Middle Section's opinion that the grammatical construction of section 4-5-325 "leaves much to be desired." *See American Child Care*, 83 S.W.3d at 151 n.1. However, given the Middle Section's clear interpretation of the statute in *American Child Care*, a case in which the Tennessee Supreme Court denied permission to appeal, and given the legislature's lack of a response in the twelve years that have followed, we are not inclined to interpret section 4-5-325 in a different manner. We also note that if we were to interpret section 4-5-325(a)(1) as only authorizing an award of attorney's fees if DCS issued a citation *knowing* that it was not well grounded in fact and law, as DCS seems to suggest, there would be little need for subsection (a)(2) of the statute, which provides for an award of attorney's fees when a citation is issued for an "improper purpose." Clearly, a citation issued with knowledge that it was not well-grounded in fact and law would have been issued for some improper purpose.

As the Court concluded in *American Child Care*, 83 S.W.3d at 152, we likewise find that "a proceeding brought with the utmost good faith may result in an award of attorneys' fees to the cited party if the citation was not well grounded in fact and not warranted by existing law." *Id.* at 152. The ALJ determined that the Fitzpatricks' indication for environmental neglect was not supported by a preponderance of the evidence. The ALJ found no evidence that the conditions in the home were either dangerous or unhealthy, or that the conditions in the home rose to the level of neglect. DCS did not seek judicial review of the ALJ's findings on this issue. Accordingly, we find that the citation for environmental neglect "was not well grounded in fact and was not warranted by existing law, rule or

regulation," *see* Tenn. Code Ann. § 4-5-325(a)(1), and therefore, the Fitzpatricks are entitled to an award of reasonable expenses, including attorney's fees they have incurred because of the citation for environmental neglect that was ultimately deemed unfounded. We reverse the portion of the chancery court's order denying the Fitzpatricks' request for attorney's fees related to the indication for environmental neglect.

The Fitzpatricks also claim that they are entitled to an award of attorney's fees for defending against the indication for lack of supervision because it was not well-grounded in fact or law, either because their due process rights were violated or because "DCS presented no evidence that leaving the boys alone constituted lack of supervision." We have previously rejected these arguments and therefore find that the Fitzpatricks are not entitled to an award of attorney's fees for unsuccessfully defending against the indication for lack of supervision.

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed in part and reversed in part. We remand for further proceedings to determine the amount of reasonable expenses to be paid pursuant to Tennessee Code Annotated section 4-5-325. Costs of this appeal are taxed to the appellants, Jeff and Melissa Fitzpatrick, and their surety, for which execution may issue if necessary.

_____

ALAN E.

-37-